# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued March 24, 2015          Decided June 23, 2015

No. 14-7094

UNITED STATES OF AMERICA, EX REL. TODD HEATH, ET AL.,
AND TODD HEATH,
APPELLANT

v.

AT&T, INC., ET AL.,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 1:11-cv-01897)

*Rose F. Luzon* argued the cause for appellant. With her on the briefs were *Scott R. Shepherd*, *Jonathan W. Cuneo*, *Matthew E. Miller*, and *James E. Miller*.

*Andrew J. Pincus* argued the cause for appellees. With him on the brief was *Paul W. Hughes*.

Before: GRIFFITH and MILLETT, *Circuit Judges*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* MILLETT.

MILLETT, *Circuit Judge*: Todd Heath appeals the dismissal of his False Claims Act *qui tam* suit against AT&T, Inc. and nineteen of its subsidiaries across the United States. The first question presented is whether an earlier and still-pending *qui tam* lawsuit filed against a single AT&T subsidiary bars this suit under the False Claims Act's first-to-file rule, 31 U.S.C. § 3730(b)(5), which prohibits *qui tam* actions that rely on the same material fraudulent actions alleged in another pending lawsuit. We hold that the first-to-file bar does not apply because the Wisconsin action alleges fraud based on affirmative pricing misrepresentations by seemingly rogue Wisconsin Bell employees. The present complaint, by contrast, alleges fraud and its concealment arising from a centralized and nationwide corporate policy of failing to enforce known statutory pricing requirements.

As a backup, AT&T proposes affirmance on the alternative ground that the complaint fails to plead the alleged fraud with sufficient particularity, as required by Federal Rule of Civil Procedure 9(b). We disagree. The complaint lays out in detail the nature of the fraudulent scheme, the specific governmental program at issue, the specific forms on which misrepresentations were submitted or implicitly conveyed, the particular falsity in the submission's content, its materiality, the means by which the company concealed the fraud, and the timeframe in which the false submissions occurred. That is sufficient on this record for the particular type of statutory fraud asserted in this case.

We accordingly reverse the judgment of the district court and remand for further proceedings.

3

# I

## Statutory Framework

### *The False Claims Act*

The False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, broadly proscribes the knowing or reckless submission of false claims for payment to the federal government or within a federally funded program. *See United States ex rel. Oliver v. Philip Morris USA Inc.*, 763 F.3d 36, 39 (D.C. Cir. 2014). As relevant here, the Act imposes liability on "any person" who "knowingly" (i) "presents, or causes to be presented, a false or fraudulent claim for payment or approval," 31 U.S.C. § 3729(a)(1)(A), (ii) "makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim," *id.* § 3729(a)(1)(B), or (iii) "makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay," or "conceals * * * an obligation to pay or transmit money or property to the Government," *id.* § 3729(a)(1)(G).

The False Claims Act defines the type of "claim" subject to those prohibitions as "any request, or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property," if that claim is "presented" or "made" to (i) "an officer, employee, or agent of the United States," or to (ii) "a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest" in which the United States government either "provides or has provided any portion of the money or property requested or demanded," or "will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded." 31 U.S.C. § 3729(b)(2)(A).

The False Claims Act's prohibitions can be enforced through both criminal and civil actions by the federal government. *See* 18 U.S.C. § 287; 31 U.S.C. § 3729. In addition, the Act authorizes private individuals—known as relators—to bring a *qui tam* civil action "in the name of the Government," 31 U.S.C. § 3730(b)(1), and to share in any damages recovered, *id.* § 3730(d). *See generally Vermont Agency of Natural Resources v. United States ex rel. Stevens*, 529 U.S. 765, 768–770 (2000).

*Qui tam* actions augment the government's limited resources by "creating a strong financial incentive for private citizens to guard against efforts to defraud the public fisc." *United States ex rel. Totten v. Bombardier Corp.*, 286 F.3d 542, 546 (D.C. Cir. 2002). But because that incentive structure can give rise to opportunistic and abusive behavior, Congress interposed a number of conditions that limit *qui tam* suits to those that expose previously undiscovered fraud or provide new, helpful information to the government. *See United States ex rel. Hampton v. Columbia/HCA Healthcare Corp.*, 318 F.3d 214, 217 (D.C. Cir. 2003) (discussing Congress's "efforts to walk a fine line between encouraging whistle-blowing and discouraging opportunistic behavior").

One such limitation is known as the "first-to-file" rule. It provides that, once a *qui tam* action has been brought, "no person other than the Government may intervene or bring a related action based on the facts underlying the pending action." 31 U.S.C. § 3730(b)(5). Actions are "related" if they assert the "'same material elements of fraud' as an earlier suit, even if the allegations 'incorporate somewhat different details.'" *Hampton*, 318 F.3d at 217 (quoting *United States*

*ex rel. Lujan v. Hughes Aircraft Co.*, 243 F.3d 1181, 1189 (9th Cir. 2001)).[1]

### *The Universal Service Fund*

In the Telecommunications Act of 1996, Congress charged the Federal Communications Commission ("FCC") with promoting universal access to advanced telecommunications and information services at just, reasonable, and affordable rates. Telecommunications Act of 1996, Pub. L. No. 104-104 § 254, 110 Stat. 56, 71–75. Under the 1996 Act and the FCC's implementing regulations, every interstate telecommunications carrier must contribute a portion of its quarterly interstate and international telecommunications revenue to the Universal Service Fund. *See* 47 C.F.R. §§ 54.706, 54.709. That portion is established by the Commission "on an equitable and nondiscriminatory basis." 47 U.S.C. § 254(d). The FCC appointed the Universal Service Administrative Company to administer the Fund, 47 C.F.R. § 54.701(a), and to use the money to support the cost of providing low-cost telecommunications services to schools, libraries, health-care providers, low-income consumers, and subscribers in high cost-areas. *See* 47 U.S.C. § 254(b); 47 C.F.R. § 54.701(c)(1).

One of the many programs administered through the Fund is the Schools and Libraries Program, commonly known as "E-Rate." *See* 47 U.S.C. § 254(h)(1)(B). The E-Rate program entitles qualifying schools and libraries to receive Internet and telephone services at discounted rates. *See*

---

[1] The Supreme Court recently clarified that this bar on related actions lasts only as long as the first-filed case remains pending. *See Kellogg Brown & Root Servs., Inc., et al. v. United States ex rel. Carter*, No. 12-1497, 575 U.S. ___, slip op. at 11–13 (2015).

*generally United States v. Green*, 592 F.3d 1057, 1060–1061 (9th Cir. 2010). To receive those discounts, the schools and libraries must first conduct a "competitive bidding process" that is open to all telecommunications service providers. 47 C.F.R. § 54.503(a). As a condition of participation, service providers may only submit bids at or below the "lowest corresponding price" offered by the company. *Id.* § 54.511(b). That is the "lowest price that a service provider charges to non-residential customers who are similarly situated." *Id.* § 54.500(f); *see also* 47 U.S.C. § 254(h)(1)(B) (the rates charged must be "less than the amounts charged for similar services to other parties").

The schools and libraries must then select the most cost-effective service from among those bids. 47 C.F.R. § 54.511(a). Once the schools and libraries have reached an agreement with a service provider, they can submit a request for funding approval to the Universal Service Administrative Company. *Id.* § 54.504(a). Once the agreement is approved, the Company will either reimburse the school or library for its payments to the service provider, or will pay the service provider's invoices directly. *Id.* § 54.514(a) & (c).

### Factual and Procedural Background

At this procedural juncture, we take the facts in the light most favorable to Heath. *See Navab-Safavi v. Glassman*, 637 F.3d 311, 318 (D.C. Cir. 2011).

**1.** Todd Heath operates a business that audits telecommunications bills to identify improper charges. In October 2011, Heath filed a *qui tam* suit against AT&T, Inc. and nineteen of its subsidiaries on behalf of the United States government, seventeen States, the District of Columbia, Chicago, and New York City. The complaint alleges that AT&T and its named subsidiaries fraudulently overbilled the

Universal Service Fund from 1997 through 2009. Complaint, *United States ex rel. Heath v. AT&T, Inc., et al.*, No. 11-1897 (D.D.C. Oct. 28, 2011) ("AT&T Nationwide Complaint").

More specifically, Heath alleges that AT&T orchestrated and implemented through its subsidiaries a corporate-wide scheme to have false claims submitted to the Universal Service Fund by depriving schools and libraries in the E-Rate program of the lowest corresponding price for services. Schools and libraries, unaware of those overcharges, then passed those inflated costs on to the federal government for reimbursement through the Universal Service Fund.

Heath also asserts that AT&T is a "recidivist E-Rate Program violator" that "previously has been investigated on multiple occasions for other significant violations of the E-Rate program." AT&T Nationwide Complaint ¶ 63. One particular investigation led to an administrative consent decree before the FCC, in which AT&T (without conceding liability) agreed to pay the federal government $500,000 and to institute a plan to ensure compliance with the program, standardize all billing procedures, and designate coordinators to answer employees' questions about E-Rate compliance. *See In the Matter of SBC Communications, Inc.*, 19 FCC Rcd. 24014, 2004 WL 2913392 (FCC 2004); *see generally FCC v. AT&T, Inc.*, 562 U.S. 397 (2011).

According to Heath, AT&T began to require employees to participate in E-Rate training in 2005, but AT&T chose not to train its employees in the lowest-corresponding-price requirement. AT&T Nationwide Complaint ¶¶ 69–70. Employees remained ignorant of the requirement until AT&T revamped its pricing scheme in 2009. *Id.* ¶ 76. Heath alleges that, as a result of AT&T's knowing or reckless decision not to train its employees, AT&T's sales representatives

nationwide overbilled E-Rate schools and libraries—that, in turn, passed those inflated costs onto the Universal Service Fund—for more than a decade. *Id.* ¶ 107–110. According to the complaint, AT&T's employees certified to the schools and libraries that every invoice complied with the FCC's rules, *id.* ¶¶ 81–94, and AT&T corporate personnel "ratified and approved" all of these actions, *id.* ¶ 41.

Heath further alleges that AT&T knew that compliance with the lowest-corresponding-price requirement was an express and material condition for reimbursement from the Universal Service Fund, yet it knowingly or recklessly failed to ensure that its employees complied with that requirement. AT&T Nationwide Complaint ¶ 101. Finally, Heath alleges that, at least since 2009, AT&T has been aware of its past violations of the lowest-corresponding-price rule, and yet concealed that information from the Universal Service Fund to avoid having to repay it. *Id.* ¶ 98–100.

**2.** This case is not Heath's first *qui tam* suit. In October 2008, Heath filed a False Claims Act *qui tam* complaint against Wisconsin Bell, Inc., a wholly owned subsidiary of AT&T. Complaint, *United States ex rel. Heath v. Wisconsin Bell, Inc.*, No. 08-cv-00876 (E.D. Wis. Oct. 16, 2008) ("Wisconsin Bell Complaint"). In that case, Heath's audit work for several Wisconsin school districts uncovered that Wisconsin Bell charged some E-Rate eligible schools more than others, and that Wisconsin Bell generally failed to provide school districts with the benefit of the favorable pricing it offered to state departments, agencies, and universities. Wisconsin Bell Complaint ¶¶ 31–39. When informed of this pricing discrepancy, Wisconsin Bell's sales representatives "regularly denied the existence of the agreements" between Wisconsin Bell and other Wisconsin agencies, and continued to "submit[] billings" for

reimbursement (or offset) from the Fund every month, "knowing that [its] billings were excessive and did not reflect the lowest corresponding prices[.]" *Id.* ¶ 39. *See generally United States ex rel. Heath v. Wisconsin Bell, Inc.*, 760 F.3d 688, 689 (7th Cir. 2014). It was "[o]nly after Heath obtained a copy of" an agreement between AT&T and the Wisconsin Department of Administration "through a public records request, [that] AT&T beg[a]n acknowledging that the contract existed and that, under it, substantially more favorable rates were available to AT&T's E-Rate school district customers." Wisconsin Bell Complaint ¶ 37. Last year, the Seventh Circuit reversed the district court's dismissal of the Wisconsin Bell Complaint, and the case remains pending in the Eastern District of Wisconsin. *See United States ex rel. Heath v. Wisconsin Bell, Inc.*, No. 08-cv-00724 (E.D. Wis.).

**3.** In the case at hand, AT&T moved to dismiss Heath's AT&T Nationwide Complaint pursuant to Federal Rules of Civil Procedure 9(b), 12(b)(1), and 12(b)(6). AT&T argued that the complaint was barred by both the first-to-file rule, 31 U.S.C. § 3730(b)(5), and the public-disclosure bar, *id.* § 3730(e)(4)(a), and that it was pled with insufficient factual specificity.

The district court dismissed the complaint for lack of jurisdiction, holding that the previously filed Wisconsin Bell case barred Heath's suit under the first-to-file rule. *United States ex rel. Heath v. AT&T, Inc., et al.*, 47 F. Supp. 3d 42, 47 (D.D.C. 2014). Specifically, the district court reasoned that, because Wisconsin Bell's relationship to its parent AT&T is apparent from the face of the Wisconsin Bell Complaint, any federal personnel or agency investigating Heath's original allegations "would be aware of the fact that there are many other state or regional AT&T operating companies that provide precisely the same services and are

owned and controlled by the same parent." *Id.* Since the E-Rate program operates nationally, the government would logically "see if there was an organization-wide practice or procedure outlined by parent AT&T, Inc., and whether other AT&T operating companies were abiding by the rules." *Id.*

## II

## Analysis

### A. The First-to-File Bar

In dismissing Heath's complaint as jurisdictionally barred by the first-to-file rule, the district court doubly erred. The first-to-file rule is not jurisdictional and, on the merits, it does not apply to Heath's complaint.

We decide *de novo* whether the statutory first-to-file limitation on *qui tam* lawsuits is jurisdictional. We also review the dismissal of a complaint for failure to state a claim *de novo*, treating Heath's factual allegations as true and giving him the benefit of all plausible inferences that can be derived from the facts alleged. *See Kowal v. MCI Communications Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994).

### *Jurisdiction*

The district court is to be forgiven for treating the first-to-file rule as jurisdictional. That is how numerous courts of appeals have characterized it. *See, e.g.*, *United States ex rel. Ven-A-Care of the Florida Keys, Inc. v. Baxter Healthcare Corp.*, 772 F.3d 932, 936 (1st Cir. 2014); *United States ex rel. Carter v. Halliburton Co.*, 710 F.3d 171, 181 (4th Cir. 2013). And last year, this court affirmed a district court's jurisdictional dismissal under Federal Rule of Civil Procedure 12(b)(1) of a complaint under the first-to-file bar, albeit

without specifically addressing whether the bar is jurisdictional. *See United States ex rel. Shea v. Cellco Partnership*, 748 F.3d 338 (D.C. Cir. 2014), *vacated*, 83 U.S.L.W. 3116 (June 1, 2015).[2]

Confronting the jurisdictional question was not necessary in *Shea* because the only issue presented on appeal was whether the district court properly dismissed the case as barred by the first-to-file rule. Even if the district court wrongly characterized its dismissal as jurisdictional, we could sustain that judgment for failure to state a claim under Rule 12(b)(6). *See Shea,* 748 F.3d at 345 (Srinivasan, J., concurring in part & dissenting in part) ("The court's affirmance, however, should not be understood as a holding that the first-to-file bar is a jurisdictional limitation."); *see also Morrison v. National Australia Bank Ltd.*, 561 U.S. 247, 254 (2010); *Sierra Club v. Jackson*, 648 F.3d 848, 854 (D.C. Cir. 2011).

Because this appeal, by contrast, raises issues under both the first-to-file bar and Federal Rule of Civil Procedure 9(b)'s heightened pleading requirement for fraud and because there is recurring confusion in the district courts, the time has come to resolve that jurisdictional question. Indeed, the Supreme Court has "endeavored in recent years to 'bring some discipline' to the use of the term 'jurisdictional,'" *Gonzalez v. Thaler*, 132 S. Ct. 641, 648 (2012); *see also United States v. Kwai Fun Wong*, 135 S. Ct. 1625, 1632 (2015); *Sebelius v. Auburn Regional Medical Ctr.*, 133 S. Ct. 817, 824 (2013), and we aim to do the same today.

---

[2] *See also United States ex rel. Batiste v. SLM Corp.*, 659 F.3d 1204, 1208 (D.C. Cir. 2011) (affirming a district court's jurisdictional dismissal based on the first-to-file bar without specifically addressing whether the bar is jurisdictional).

Truly jurisdictional rules "govern 'a court's adjudicatory authority,'" obligating courts to "consider *sua sponte* issues that the parties have disclaimed or have not presented." *Gonzalez*, 132 S. Ct. at 648. Such objections may be raised "at any point in the litigation, and a valid objection may lead a court midway through briefing to dismiss a complaint in its entirety." *Id.* Courts should not lightly attach such drastic consequences to a procedural requirement. Instead, such rules will be held to "cabin a court's power only if Congress has 'clearly state[d]' as much." *Kwai Fun Wong*, 135 S. Ct. at 1632 (alteration in original). Absent such a clear statement, "courts should treat the restriction as nonjurisdictional in character." *Auburn Regional*, 133 S. Ct. at 824 (internal quotation marks omitted).

The first-to-file bar provides that, once a *qui tam* action has been brought on a claim, "no person other than the Government may intervene or bring a related action based on the facts underlying the pending action." 31 U.S.C. § 3730(b)(5). That language "does not speak in jurisdictional terms or refer in any way to the jurisdiction of the district courts." *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 515 (2006) (quoting *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 394 (1982)). The text speaks only to who may bring a private action and when; it says nothing about the court's "power" to consider claims. *Kwai Fun Wong*, 135 S. Ct. at 1632.

The statutory structure confirms what the plain text indicates. When Congress wanted limitations on False Claims Act suits to operate with jurisdictional force, it said so explicitly. For example, while the first-to-file bar appears in a subsection labeled "Actions by Private Persons," a neighboring subsection is labeled "Certain Actions Barred" and a number of those provisions are expressly couched in jurisdictional terms. Section 3730(e)(1) directs that "[*n*]*o*

*court shall have jurisdiction* over an action brought by a former or present member of the armed forces * * * against a member of the armed forces arising out of such person's service[.]" 31 U.S.C. § 3730(e)(1) (emphasis added). Section 3730(e)(2) likewise commands that "[*n*]*o court shall have jurisdiction* over an action brought * * * against a Member of Congress, a member of the judiciary, or a senior executive branch official if the action is based on evidence or information known to the Government when the action was brought." *Id.* § 3730(e)(2)(A) (emphasis added).

Congress, in other words, knew how to reference "jurisdiction expressly" in the False Claims Act if "that [was] its purpose."[3] But it did not do so in the first-to-file rule.[4] Because nothing in the text or structure of the first-to-file rule suggests, let alone "clearly state[s]," that the bar is jurisdictional, *Kwai Fun Wong*, 135 S. Ct. at 1632, we hold

---

[3] *Equal Employment Opportunity Comm'n v. Lutheran Social Services*, 186 F.3d 959, 962 (D.C. Cir. 1999) (quoting *I.A.M. National Pension Fund Benefit Plan C v. Stockton Tri Industries*, 727 F.2d 1204, 1208 (D.C. Cir. 1984)); *see United States v. Papagno*, 639 F.3d 1093, 1099 (D.C. Cir. 2011) ("As the Supreme Court has often stated, when 'Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.'") (quoting *Kucana v. Holder*, 558 U.S. 233, 249 (2010)).

[4] It is noteworthy that, in its most recent False Claims Act case, the Supreme Court addressed the operation of the first-to-file bar on decidedly nonjurisdictional terms, raising the issue *after* it decided a nonjurisdictional statute of limitations issue. Moreover, nothing in the Court's analysis sounded in jurisdictional terms. *Kellogg Brown & Root*, No. 12-1497, slip op. at 11–13.

that the first-to-file rule bears only on whether a *qui tam* plaintiff has properly stated a claim.

### *Application of the First-to-File Rule*

Once a suit has been filed under the False Claims Act, the first-to-file rule prohibits any person, other than the government, from "bring[ing] a related action based on the facts underlying the pending action." 31 U.S.C. § 3730(b)(5). A second action is "related," within the meaning of the first-to-file bar, if the claims incorporate "the same material elements of fraud" as the earlier action, even if the allegations incorporate additional or somewhat different facts or information. *Hampton*, 318 F.3d at 217. Similarity is assessed by comparing the complaints side-by-side, and asking whether the later complaint "alleges a fraudulent scheme the government already would be equipped to investigate based on [the first] [c]omplaint." *United States ex rel. Batiste v. SLM Corp.*, 659 F.3d 1204, 1209 (D.C. Cir. 2011).

That comparative analysis demonstrates that Heath's two complaints target factually distinct types of frauds. The Wisconsin Bell Complaint alerted the federal government only to a limited scheme by Wisconsin Bell to defraud the E-Rate program within Wisconsin. That alleged fraud was accomplished, in part, through affirmative misrepresentations by Wisconsin Bell employees to schools and libraries within Wisconsin, in which those employees openly denied the existence of a state contract with a lower corresponding price.

In contrast, the AT&T Nationwide Complaint alleges a different and more far-reaching scheme to defraud the federal government through service contracts entered into across the Nation, and then to cover up that fraud. Critically, the alleged fraud was accomplished not through affirmative

misrepresentations about the lowest corresponding price, but through institutionalized disregard of the lowest-corresponding-price requirement altogether in AT&T's employee-training and billing procedures. According to the AT&T Nationwide Complaint, AT&T and its subsidiaries deliberately failed to enforce that lowest-price mandate by refusing to train or even tell employees about that limitation on charges, and by failing to incorporate that limitation into its billing practices. AT&T Nationwide Complaint ¶¶ 70–71. As a result, AT&T knowingly or recklessly caused schools and libraries to overbill the E-Rate Program. *Id.* ¶¶ 107–109.

Heath further alleges that, in 2009, AT&T rectified its practices to ensure, for the first time, that its employees complied with the lowest-corresponding-price requirement. AT&T Nationwide Complaint ¶ 76. But even though AT&T knew "the full extent of its past wrongdoing" and knew it had a clear duty to tell the government about the overbilling, it did not do so. *Id.* ¶ 79. Instead, the complaint alleges, AT&T knowingly concealed those violations to avoid having to reimburse the Universal Service Fund, in violation of 31 U.S.C. § 3729(a)(1)(G). *Id.* ¶ 110.

On its face, the Wisconsin Bell complaint discloses nothing more than the rogue actions of individuals within a single AT&T subsidiary and their specific, overt misrepresentations. Nothing in the complaint would have alerted the United States government to a nationwide scheme centered in AT&T's corporate headquarters of mischarging the E-Rate program and subsequently concealing those overpayments. Nor, given the affirmative misrepresentations at issue, would the Wisconsin Bell Complaint have pointed the federal government to AT&T's systematic refusal to institutionalize compliance by employees with the lowest-corresponding-price requirement.

16

The fraud thus manifested itself in sufficiently distinct ways in the two cases that the material elements of the fraud differ. As the Seventh Circuit has recognized, "to understand whether the suits materially overlap we must know whether the initial suit[] alleged frauds by rogue personnel at scattered offices or instead alleged a scheme orchestrated by * * * national management." *United States ex rel. Chovanec v. Apria Healthcare Group, Inc.*, 606 F.3d 361, 364 (7th Cir. 2010). Because the Wisconsin Bell Complaint alleged only the former, it did not disclose the nationwide fraud grounded in institutionalized training and enforcement failures, and compounded by efforts at concealment, that is the focus of Heath's later complaint.

The cases on which AT&T relies presented the obverse scenario. *Shea*, *Hampton*, and *Batiste* all involved situations where the first complaint alleged a broad fraudulent scheme orchestrated by a national or parent company, and the second complaint merely added additional facts or widened the circle of victims of the same fraudulent conduct. For example, in the now-vacated decision in *Shea*, the relator's first complaint alleged that Verizon had engaged in "uniform billing practices" that had improperly charged a number of government agencies. 748 F.3d at 342. The second complaint alleged the exact same fraudulent scheme, adding only that Verizon's fraudulent uniform billing practices also swept in government contractors. *Id*. The first-to-file rule barred the second action because the first complaint had already put the government on notice of both the nature and reach of the alleged fraud. *Id.* ("Presumably, if Verizon's billing practice was truly uniform, it was so as to all government contracts, not just [as to those alleged in the first complaint].").

Likewise, in *Hampton*, the first complaint alleged "a corporate-wide problem" in which the parent company "perpetrated fraud in providing home health care services through numerous subsidiaries" in 37 States. 318 F.3d at 218. The first-to-file bar applied because the second complaint did nothing more than allege that another subsidiary perpetuated the same fraud in six more States. *Id.*; *see also Batiste*, 659 F.3d at 1209 (first-to-file rule applied when the first complaint alleged that "corporate policies" perpetuated a "nationwide scheme attributable not only to the subsidiary, but also to [the parent company]," and the second complaint simply asserted the same fraudulent practices in another subsidiary).

Those cases stand for the simple proposition that the greater fraud often includes the lesser. The problem for AT&T is that the lesser fraud does not, without more, include the greater. The Wisconsin Bell Complaint did not allege that AT&T encouraged Wisconsin Bell's fraud or affirmative misrepresentations, or even knew anything about them. Nor did the Wisconsin Bell Complaint suggest that AT&T and its subsidiaries engaged in "uniform billing practices" across the United States. *Shea*, 748 F.3d at 342. There simply is no hint in the Wisconsin Bell Complaint of a country-wide, institutionalized corporate practice of disregarding the lowest-price requirement or of a calculated refusal to educate or train employees.

AT&T emphasizes that E-Rate is a national program so that the government "naturally would have examined the actions of the other operating subsidiaries." AT&T Br. 19. Surely AT&T does not mean that, every time a handful of individuals within a single subsidiary engage in fraud, the federal government should presume that the misconduct was orchestrated, as a matter of corporate policy, from AT&T's central headquarters. Without more, one subsidiary's

infractions do not presumptively symptomize a corporate-pervading problem. A single broken branch does not mean that the entire tree is diseased.

AT&T is, of course, correct that the E-Rate program is a national program. So is virtually every law policed by the *federal* False Claims Act. To hold, as AT&T suggests, that the first-to-file bar kicks in every time an initial complaint alleges that a subsidiary of a national company violated a national law would erase a broad swath of False Claims Act coverage. The point of the first-to-file bar is not to allow isolated misconduct to inoculate large companies against comprehensive fraud liability. The point, instead, is to prevent copycat litigation, which tells the government nothing it does not already know. Because Heath's complaints go after two materially distinct fraud schemes, the first-to-file bar does not apply.

## B. Federal Rule of Civil Procedure 9(b)

AT&T argues that the district court's judgment can be affirmed on the alternative ground that Heath's complaint failed to plead the alleged fraud with the particularity that Federal Rule of Civil Procedure 9(b) requires.[5] AT&T raised this argument before the district court, but the district court did not reach the issue. *Heath*, 47 F Supp. 3d at 44 n.2. We, however, can affirm a judgment on any basis adequately preserved in the record below. *Queen v. Schultz*, 747 F.3d 879, 884 (D.C. Cir. 2014); *see also Kaemmerling v. Lappin*, 553 F.3d 669, 676 (D.C. Cir. 2008) (compliance with Rule

---

[5] "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b).

9(b)'s pleading requirement may be independently assessed by the court of appeals in the first instance).

Rule 9(b) requires Heath to "state with particularity the circumstances constituting fraud[.]" Fed. R. Civ. P. 9(b). The rule serves to "discourage[] the initiation of suits brought solely for their nuisance value, and safeguards potential defendants from frivolous accusations of moral turpitude." *United States ex rel. Williams v. Martin-Baker Aircraft Co., Ltd.*, 389 F.3d 1251, 1256 (D.C. Cir. 2004) (quoting *United States ex rel. Joseph v. Cannon*, 642 F.2d 1373, 1385 (D.C. Cir. 1981)). In addition, "because 'fraud' encompasses a wide variety of activities," the complaint must be particular enough to "guarantee all defendants sufficient information to allow for preparation of a response." *Id.*

Heath's AT&T Nationwide Complaint satisfies Rule 9(b). It sets forth in sufficient detail the time, place, and manner of AT&T's scheme to defraud the Universal Service Fund. From 1997 to 2009, the complaint alleges, AT&T knowingly failed to enforce institutional compliance with the lowest-corresponding-price requirement. AT&T Nationwide Complaint ¶¶ 61–62. That behavior continued even after the 2004 consent decree obligated AT&T to standardize billing practices and to train its employees. *Id.* ¶¶ 64–70. Because AT&T "continued to ignore the Company's responsibility to offer" the lowest corresponding price, AT&T's employees remained ignorant of the requirement and consistently overcharged E-Rate eligible schools and libraries. *Id.* ¶ 71. As a result, AT&T "knowingly has caused school districts and libraries to submit false claims for payment to [the Universal Service Administrative Company], knowing that such false claims would be submitted * * * for reimbursement" from the federal program. *Id.* ¶ 108.

To support those allegations, the complaint includes copies of AT&T's training materials. AT&T Nationwide Complaint Exhibit 3, Appendix 150–279. The complaint also alleges that an audit of AT&T's bills to the Detroit public school system revealed that, between 2005 and 2010, AT&T overbilled the E-Rate eligible schools by at least $2.8 million. AT&T Nationwide Complaint ¶¶ 103–104.

In short, Rule 9(b)'s requirements of particularity as to who (AT&T), what (detailed identification of a centralized and institutionalized failure to comply with the lowest-corresponding-price requirement, which resulted in massive overbilling of a governmental program), where (through nineteen subsidiaries and their interactions with E-Rate schools and libraries across the Country), and when (1997 to 2009) have been satisfied. The complaint thus put AT&T on fair notice of the fraud of which it is accused: That, even in the wake of a consent decree pertaining to pervasive E-Rate problems, AT&T persisted in knowingly or recklessly failing to comply with the lowest-corresponding-price requirement, which it knew was a material condition for E-Rate reimbursement, which caused false claims to be submitted and their payment later concealed.

AT&T makes three objections to the complaint's sufficiency, none of which succeeds. First, AT&T stresses that the complaint fails to identify specific, affirmative misrepresentations to the United States government. More specifically, AT&T notes that Heath's complaint relies on the FCC's Form 473, which requires AT&T to confirm annually "that the invoice forms submitted by each service provider are in compliance with the FCC's rules[.]" AT&T Nationwide Complaint ¶ 82. According to AT&T, during the complaint's time period, Form 473 did not require companies to certify compliance with the lowest-corresponding-price requirement.

While the absence of allegations of affirmative misrepresentations might underscore a difference between this case and the Wisconsin case, the argument does not help AT&T because fraud could be proven even without explicit certifications of compliant rates. A fraud case can rest on "implied" certifications if the defendant knowingly "withheld information about its noncompliance with material contractual requirements." *United States v. Science Applications Int'l Corp.*, 626 F.3d 1257, 1269 (D.C. Cir. 2010).

The AT&T Nationwide Complaint includes sufficient allegations of such implicit certifications. According to Heath, during all relevant periods, the lowest-corresponding-price requirement "was an express requirement of the E-Rate program." AT&T Nationwide Complaint ¶ 101. Compliance "was a material condition for reimbursement," *id.*, and if the Universal Service Administrative Company had known about AT&T's noncompliance, "it would have deemed all requests for reimbursement for AT&T's services ineligible, and would not have issued payments on invoices submitted by AT&T, or by the schools and libraries, for E-Rate Program services provided by AT&T," *id.* ¶ 99. Furthermore, Heath alleges that AT&T knew that compliance was a material and express condition for reimbursement. *Id.* ¶ 99–101.

Second, AT&T objects that the complaint fails to identify the specific actors who made the false statements or misrepresentations. But unlike cases in which relators have vaguely alleged that 'some managers' perpetuated fraud, Heath *does* identify a specific actor—AT&T itself. *See Cook County v. United States ex rel. Chandler*, 538 U.S. 119, 125–126 (2003) ("While § 3729 does not define the term 'person,' * * * [t]here is no doubt that the term then extended to corporations[.]"); *cf. Williams*, 389 F.3d at 1256. The complaint alleges that AT&T deliberately omitted E-Rate's

lowest-corresponding-rate requirements from its pricing and billing scheme and chose not to train its employees in E-Rate compliance, leaving its subsidiaries' employees unaware of the illegality of their actions.

For a fraud like that, alleging with specificity how the company itself institutionalized and enforced its fraudulent scheme, and how it was manifested in corporate training materials and audit reports, sufficiently identifies who committed the fraud for the purposes of Rule 9(b). The complaint makes clear, in other words, that corporate levers were pulled; identifying precisely who pulled them is not an inexorable requirement of Rule 9(b) in all cases. *See United States ex rel. Bledsoe v. Community Health Systems, Inc.*, 501 F.3d 493, 509 (6th Cir. 2007) ("[W]here the corporation is the defendant in a [False Claims Act] action, we hold that a relator need not always allege the specific identity of the natural persons within the defendant corporation * * *. [S]uch information is merely relevant to the inquiry of whether a relator has pled the circumstances constituting fraud with particularity.").

Third, AT&T argues that the complaint lacks "representative samples" of the claims that specify the time, place, and content of the bills. That goes too far. Rule 9(b) does not inflexibly dictate adherence to a preordained checklist of "must have" allegations. *See Thayer v. Planned Parenthood of the Heartland*, 765 F.3d 914, 918 (8th Cir. 2014) ("Rule 9(b) is context specific and flexible[.]") (internal quotation marks omitted); *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 188 (5th Cir. 2009) ("Rule 9(b)'s ultimate meaning is context-specific, and thus there is no single construction of Rule 9(b) that applies in all contexts.").

Instead, the point of Rule 9(b) is to ensure that there is sufficient substance to the allegations to both afford the defendant the opportunity to prepare a response and to warrant further judicial process. *See Williams*, 389 F.3d at 1256. What allegations are needed to invest the complaint with indicia of reliability, moreover, may depend on the nature of the fraud alleged and its statutory or common-law source. *See generally Grubbs*, 565 F.3d at 188–189.

For example, False Claims Act *qui tam* complaints, unlike common law or securities fraud claims, do not require the plaintiff to prove either that a party relied on a specific representation or that there has been a monetary injury. *Grubbs*, 565 F.3d at 189. A person that presented fraudulent claims that were never actually paid remains civilly liable. *Id.* In that context, providing identifying details about specific payments is less important to put the defendant on notice. Nor would such details serve the purpose of the False Claims Act in this context. The federal government itself already has records of those payments and thus "rarely if ever needs a relator's assistance to identify claims for payment that have been submitted[.]" *See* Br. for the United States as Amicus Curiae at 16, *United States ex rel. Nathan v. Takeda Pharm. N. Am., Inc.*, 134 S. Ct. 1759 (2014). Instead, in such cases, the greater concern is with the "other information" relators have "that shows those claims to be false." *Id.*

We accordingly join our sister circuits in holding that the precise details of individual claims are not, as a categorical rule, an indispensable requirement of a viable False Claims Act complaint, especially not when the relator alleges that the defendant knowingly caused a third party to submit a false claim as part of a federal regulatory program. *See Foglia v. Renal Ventures Mgmt., LLC*, 754 F.3d 153, 156–157 (3d Cir. 2014); *Ebeid ex rel. United States v. Lungwitz*, 616 F.3d 993,

998–999 (9th Cir. 2010); *United States ex rel. Lemmon v. Envirocare of Utah, Inc.*, 614 F.3d 1163, 1172–1173 (10th Cir. 2010); *United States ex rel. Lusby v. Rolls-Royce Corp.*, 570 F.3d 849, 854 (7th Cir. 2009); *United States ex rel. Duxbury v. Ortho Biotech Prods., LP*, 579 F.3d 13, 29 (1st Cir. 2009); *Grubbs*, 565 F.3d at 190. The central question, instead, is whether the complaint alleges "particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." *Grubbs*, 565 F.3d at 190.

Heath's complaint passes that test. He provides factual specificity concerning the type of fraud, how it was implemented, and the training materials used, all of which is then corroborated by the concrete example of the Detroit audit documenting the very type of overbilling that follows the complaint's pattern.

AT&T relies on a handful of cases from outside this circuit to suggest that relators must always plead specific, representative samples. AT&T Br. 27 (citing *United States ex rel. Dunn v. North Mem'l Health Care*, 739 F.3d 417, 418 (8th Cir. 2014); *United States ex rel. Nathan v. Takeda Pharm. N. Am., Inc.*, 707 F.3d 451, 456–460 (4th Cir. 2013), *cert. denied*, 134 S. Ct. 1759 (2014); *United States ex rel. SNAPP, Inc. v. Ford Motor Co.*, 532 F.3d 496, 503 (6th Cir. 2008); *United States ex rel. Joshi v. St. Luke's Hospital, Inc.*, 441 F.3d 552, 557 (8th Cir. 2006)). Those circuits, however, do not read their precedent as rigidly as AT&T does and, in fact, have acknowledged the need for some functional flexibility in reviewing a complaint's allegations. *See, e.g.*, *Thayer*, 765 F.3d at 918 ("We agree that '[s]tating "with particularity the circumstances constituting fraud" does not necessarily and always mean stating the contents of a bill.'") (alteration in original); *Nathan*, 707 F.3d at 457 (requiring

only "some indicia of reliability" that a false claim had been presented to the government); *Chesbrough v. Visiting Physicians Ass'n*, 655 F.3d 461, 471 (6th Cir. 2011) ("[W]e do not foreclose the possibility that this court may apply a 'relaxed' version of Rule 9(b) in certain situations[.]").

Moreover, to require relators to plead representative samples of claims actually submitted to the government would require relators, before discovery, to prove more than the law requires to be established at trial. *See Lusby*, 570 F.3d at 854–855; *Grubbs*, 565 F.3d at 188–189. To win his case, a relator does not need to identify "exact dollar amounts, billing numbers, or dates to prove to a preponderance that fraudulent bills were actually submitted." *Grubbs*, 565 F.3d at 190. We decline to read Rule 9(b) as requiring more factual proof at the pleading stage than is required to win on the merits.[6]

## IV

### Conclusion

The first-to-file rule is a nonjurisdictional procedural bar that does not apply here because the frauds alleged in Heath's two cases differ in material respects. We also hold that the AT&T Nationwide Complaint complies with the pleading requirements of Federal Rule of Civil Procedure 9(b). We accordingly reverse the judgment of the district court dismissing the complaint and remand for further proceedings.

*So ordered.*

---

[6] AT&T argued below that the public-disclosure bar, 31 U.S.C. § 3730(e)(4)(a), also requires dismissal of the complaint. That argument was not pressed here, and we take no position on it.