# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued January 15, 2016          Decided June 21, 2016

No. 15-7049

UNITED STATES, EX REL. ANTHONY OLIVER,
AND
ANTHONY OLIVER,
APPELLANT

v.

PHILIP MORRIS USA INC., A VIRGINIA CORPORATION,
FORMERLY KNOWN AS PHILIP MORRIS INCORPORATED,
APPELLEE

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:08-cv-00034)

———

*David S. Golub* argued the cause for appellant. With him on the brief were *Carl S. Kravitz* and *Jason M. Knott*.

*Elizabeth P. Papez* argued the cause for appellee. With her on the brief were *Andrew C. Nichols*, *Eric M. Goldstein*, *Eric T. Werlinger*, and *Thomas J. Frederick*. *Ilan Wurman* entered an appearance.

Before: ROGERS and WILKINS, *Circuit Judges*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* WILKINS.

WILKINS, *Circuit Judge*: Appellant and relator Anthony Oliver brings this *qui tam* action alleging that Appellee Philip Morris USA violated the False Claims Act ("FCA"), 31 U.S.C. §§ 3729-3733 (2006),[1] by charging the Navy Exchange Service Command ("NEXCOM") and the Army and Air Force Exchange Service ("AAFES") prices for cigarettes that violated the terms of their contracts. The District Court concluded that it lacked jurisdiction to hear the claim under the FCA's public disclosure bar, 31 U.S.C. § 3730(e)(4)(A). After reviewing the record, we affirm the judgment of the District Court. The transactions that Oliver contends create an inference of fraud were publicly disclosed through a statutorily enumerated channel, triggering the jurisdictional bar. Additionally, Oliver does not possess any direct information about the underlying transactions that would allow him to rescue his claim from the jurisdictional bar by qualifying as an original source.

## I.

Oliver is the President and CEO of Medallion Brands International Company ("Medallion"), which sells tobacco products to civilian and military markets in the United States and abroad.[2] NEXCOM and AAFES (collectively "the

---

[1] All citations are to the 2006 version of the statute unless otherwise noted.

[2] The facts are taken from the second amended complaint ("Complaint" or "Compl.") and Oliver's supporting declaration. For purposes of a motion to dismiss, the facts alleged in the Complaint are taken to be true, and all inferences are drawn in Oliver's favor. *See U.S. ex rel. Davis v. District of Columbia*, 679 F.3d 832, 834-35 (D.C. Cir. 2012). We may also consider Oliver's

Exchanges") provide goods and services to customers in the military community. Each of the Exchanges' contracts with its vendors includes "Most Favored Customer" provisions (the "MFC provisions"). These provisions ensure that "the prices paid by [the Exchanges] for the products they purchase are equal to or more favorable than the prices, including any customer discounts, at which the vendors sell like products to other non-governmental and government purchasers." Compl. ¶ 9, J.A. 17. Philip Morris USA ("Philip Morris" or "PM USA") has, since at least 2002, sold cigarette products to the Exchanges pursuant to contracts including the MFC provisions. Despite Philip Morris's knowledge of the MFC provisions, Philip Morris sold the Exchanges at least 1.8 million cartons of cigarettes at prices higher than the MFC provisions require. Specifically, Philip Morris sold cigarettes to Philip Morris Duty Free, Inc., ("PM DFI") and Philip Morris International, Inc. ("PMI"), at prices lower than the prices sold to the Exchanges. One of these affiliates purchased Philip Morris cigarettes for resale on American Samoa at a cost of $13.83 per carton, while NEXCOM purchased cigarettes for the Navy on Guam at a cost of $27.77 less a $4.00 rebate, for a price differential of $9.94.

Oliver filed this action in 2008 alleging that these transactions violated the MFC provisions, and, as a result, the FCA. The FCA removes jurisdiction from the federal courts for certain actions brought under it. 31 U.S.C. § 3730(e).[3] Specifically, the statute provides:

---

declaration to determine whether we have jurisdiction. *See Coal. for Underground Expansion v. Mineta*, 333 F.3d 193, 198 (D.C. Cir. 2003).

[3] This provision was amended by the Patient Protection and Affordable Care Act, Pub. L. 111-148, 124 Stat. 119 (2010).

> No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

*Id.* § 3730(e)(4)(A).[4]  The FCA further defines an original source as "an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information." *Id.* § 3730(e)(4)(B).[5]

The District Court dismissed Oliver's complaint in 2013, reasoning that Oliver's action was subject to the FCA's jurisdictional bar and that he did not qualify as an original source. *U.S. ex rel. Oliver v. Philip Morris*, 949 F. Supp. 2d 238, 251 (D.D.C. 2013).  Oliver appealed, and we vacated and remanded. *U.S. ex rel. Oliver v. Philip Morris* (*Oliver I*), 763 F.3d 36, 44 (D.C. Cir. 2014).  In *Oliver I*, we held that the FCA's public disclosure bar was not triggered because "Philip Morris . . . made no attempt to show that its allegedly false certifications of compliance with [the MFC] provisions were in the public domain." *Id.* at 41.  We rejected Philip Morris's contention that Government awareness of the MFC provisions

---

[4] This provision is also referred to as the "public disclosure bar."

[5] The current version of the statute defines an original source as "an individual who . . . has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions."  31 U.S.C. § 3730(e)(4)(B) (2012).

constituted public disclosure that triggers the FCA's jurisdictional bar. *Id.* at 42. Additionally, we held that the Iceland Memo, a 1999 inter-office memorandum discussing concerns about cigarette pricing at a United States naval station in Iceland, did not publicly disclose the MFC provisions or Philip Morris's obligation to charge the Exchanges its lowest price for cigarettes. *Id.* at 43. We also rejected efforts by Philip Morris after oral argument to demonstrate that the MFC provisions were generally available so as to trigger the public disclosure bar because it had abandoned those arguments on appeal and submitted new evidence that we were unable to properly evaluate. *Id.* at 43-44. Accordingly, we vacated the District Court's decision and remanded the case for further proceedings. *Id.* at 44.

On remand, Philip Morris moved again to dismiss the complaint for lack of subject matter jurisdiction. This time, Philip Morris argued that the FCA's public disclosure bar was triggered because the MFC provisions were published online prior to the filing of the complaint. The District Court concluded that, based on the archived webpages Philip Morris submitted in conjunction with its motion, the MFC provisions were publicly disclosed in an "administrative report" and in the "news media," and that the allegations or transactions in the complaint were substantially similar to those in the public domain. *U.S. ex rel. Oliver v. Philip Morris USA, Inc.*, 101 F. Supp. 3d 111, 123-27 (D.D.C. 2015). The District Court also concluded that Oliver did not qualify as an "original source" under the statute and once more dismissed the Complaint. *Id.* at 127-29.

## II.

We review *de novo* a dismissal for lack of subject matter jurisdiction. *Oliver I*, 763 F.3d at 40.

6

A.

As we explained in *Oliver I*, "[t]he False Claims Act's public disclosure bar states that a court lacks subject matter jurisdiction over an action 'based upon the public disclosure of allegations or transactions.'" 763 F.3d at 40 (quoting 31 U.S.C. § 3730(e)(4)(A)). "Transaction" in this sense "refers to two or more elements that, when considered together, give rise to an inference that fraud has taken place." *Id.* at 40 (citing *U.S. ex rel. Springfield Terminal Co. v Quinn*, 14 F.3d 645 (D.C. Cir. 1994)). *Springfield Terminal* provides the familiar equation we use in such cases:

> [I]f X+Y=Z, Z represents the *allegation* of fraud and X and Y represent its essential elements. In order to disclose the fraudulent *transaction* publicly, the combination of X and Y must be revealed, from which readers or listeners may infer Z, *i.e.*, the conclusion that fraud has been committed. The language employed in § 3730(e)(4)(A) suggests that Congress sought to prohibit *qui tam* actions *only* when *either* the allegation of fraud [Z] *or* the critical elements of the fraudulent transaction themselves were in the public domain.

14 F.3d at 654 (final two emphases added). In other words, we lack subject matter jurisdiction if either of the following has been publicly disclosed: (1) the allegation of fraud itself, or (2) the transactions that give rise to an inference of fraud. Applied to this case, the transaction would be "the fact that Philip Morris was not providing the Exchanges with the best price for cigarettes (X) plus the fact that Philip Morris falsely

certified that it complied with the Most Favored Customer provisions (Y)," which "gives rise to the conclusion Philip Morris committed fraud (Z)." *Oliver I*, 763 F.3d at 41. Accordingly, we "lack[] jurisdiction over Oliver's suit only if X *and* Y, i.e., *both* the pricing disparities *and* Philip Morris's false certifications of compliance with the Most Favored Customer provisions, were in the public domain." *Id.*

As a threshold matter, though not invoking the law of the case doctrine, Oliver appears to argue that we already held that the transactions were not publicly disclosed. *See* Appellant Br. at 29. This is too broad a reading of *Oliver I*. In our earlier opinion, we concluded that "[t]he Iceland Memo, *standing alone*, does not communicate that there was anything *legally impermissible* about the prices Philip Morris was charging the Exchanges." *Oliver I*, 763 F.3d at 43 (emphasis added). In evaluating only the Y term, we found that neither the MFC provisions nor Philip Morris's fraudulent certifications that it complied with them was publicly disclosed. *Id.* at 41-43. We explicitly did not resolve the potential disclosure of the pricing disparities in the memo. *Id.* at 41. *Oliver I* thus never reached the X term and only reflects that the Iceland Memo does not provide the Y term. On remand, the District Court concluded that the Iceland Memo provided the X term and was publicly disclosed, and that Philip Morris provided evidence that the Y term was also publicly disclosed. *Oliver*, 101 F. Supp. 3d at 123-27. Accordingly, we must resolve whether the District Court was correct in holding that these X and Y terms constitute publicly disclosed transactions.

1.

We turn first to whether the Iceland Memo publicly discloses the price differential alleged in Oliver's Complaint.

Oliver argues that the Iceland Memo does not publicly disclose that Philip Morris was not providing cigarettes at the best price to the Exchanges. Oliver concedes that "the Iceland Memo does reflect a differential between the prices charged to the military and to private parties." Appellant Br. at 34. However, he argues that the price differential revealed in the memo is not the same as what he alleges in his complaint because the Iceland Memo involves different time periods, MFC provisions, and corporate sales.

"We have explained that a suit is 'based upon' publicly disclosed 'allegations or transactions' when the allegations in the complaint are 'substantially similar' to those in the public domain." *U.S. ex rel. Davis v. District of Columbia*, 679 F.3d 832, 836 (D.C. Cir. 2012) (quoting *U.S. ex rel. Findley v. FPC-Boron Emps.' Club*, 105 F.3d 675, 682 (D.C. Cir. 1997)*, abrogated on other grounds by Rockwell Int'l Corp. v. United States*, 549 U.S. 456 (2007)); *see also Findley*, 105 F.3d at 690 ("We have already decided that the public disclosure bar is triggered when a relator files an action that is substantially similar to 'allegations or transactions' already in the public domain."). "This rule prevents suits by those other than an 'original source' when the government already has enough information 'to investigate the case and to make a decision whether to prosecute' or where the information 'could at least have alerted law-enforcement authorities to the likelihood of wrongdoing.'" *Davis*, 679 F.3d at 836 (quoting *Springfield Terminal*, 14 F.3d at 654). Merely providing "more specific details" about what happened does not negate substantial similarity. *Id.* Additionally, "a relator's ability to reveal specific instances of fraud where the general practice has already been publicly disclosed is insufficient to prevent operation of the jurisdictional bar." *U.S. ex rel. Settlemire v. District of Columbia*, 198 F.3d 913, 919 (D.C. Cir. 1999) (citing *Findley*, 105 F.3d at 687-88).

The price difference alleged in the Complaint is substantially similar to the price difference the Iceland Memo describes. According to the Complaint, Philip Morris sold identical cigarettes to PM DFI and PMI "at prices lower than the prices such cigarettes were sold to" the Exchanges. Compl. ¶ 25, J.A. 21. The Complaint further alleges that

> over the period covered by this . . . Complaint, one or more of defendant's affiliates purchased defendant's cigarette products from defendant (at a price well below the price charged to NEXCOM) and re-sold such cigarettes to the civilian duty-free market on American Samoa.

*Id.* ¶ 26, J.A. 21. Also according to the Complaint, "[s]imilar price differentials have existed throughout th[is] period . . . for sales by defendant's affiliates of defendant's cigarettes to the duty-free and foreign markets comparably situated to AAFES overseas military exchanges." *Id.* ¶ 27, J.A. 21.

The Iceland Memo, dated December 28, 1999, outlines Philip Morris's general practice of selling Philip Morris products to the military at a price higher than that which Philip Morris sells cigarettes off its duty-free price list to other overseas Philip Morris customers. It states that "PMI Duty-Free list prices are lower than PM USA Military tax-free prices and we frequently receive inquiries from the Service Headquarters on why they can't purchase tax-free product at these lower prices." J.A. 74. The memo was generated as a result of a "letter written by the Director, Morale, Welfare & Recreation (MWR) Department at the U.S. Naval station in Keflavik, Iceland to a duty-free wholesaler in Norfolk, Virginia" because "the MWR facility . . . tried, unsuccessfully, to have a duty-free wholesaler . . .

supply them with Philip Morris products." J.A. 74. The memo notes that "PM USA is responsible for U.S. Military markets worldwide and is the source for product to MWR facilities" which "are independent operations and not associated with [the Exchanges]." J.A. 74.[6] The memo attributes the price differential to obligations to comply with Surgeon General warnings. Although Oliver provides more specific details about this general practice in his complaint, such as the $4.00 price differential between affiliate resale in American Samoa and NEXCOM resale in Guam, these additional details do not mean the transaction was not already publicly disclosed. *Cf. Settlemire*, 198 F.3d at 919.

Oliver's attempts to distinguish the Iceland Memo are unpersuasive. Although the Iceland Memo predates the sale of cigarettes alleged in the complaint, we have found "disclosures going back as far as forty years prior to the relator's lawsuit . . . sufficient to disclose the practices which formed the basis of the relator's suit." *Id.* Accordingly, the time difference does not undermine the disclosure of Philip Morris's general practice. Furthermore, Oliver's remaining objections amount to an argument that the Iceland Memo fails to establish that the sale of cigarettes breaches the specific MFC provisions of the Exchanges' contracts. However, "[t]here is no requirement . . . that the relevant public disclosures irrefutably prove a case of fraud. It is sufficient that the 'publicly disclosed transaction is sufficient to raise the inference of fraud.'" *Id.* (quoting *Findley*, 105 F.3d at 687-88). Here, the Iceland Memo must simply demonstrate

---

[6] The details of the Iceland MWR facility's operations and its relationship with the Exchanges and Philip Morris are not clear from the record. This ambiguity does not impact our analysis, however, which relies only on the Iceland Memo's disclosure that Philip Morris charged the Exchanges higher prices than PMI charged other overseas customers. *See* J.A. 74.

knowledge "that Philip Morris was not providing the Exchanges with the best price for cigarettes." *Oliver I*, 763 F.3d at 41. The Iceland Memo establishes that PM USA routinely sold cigarettes at prices lower than those at which the military could purchase cigarettes, providing "the government . . . [with] enough information 'to investigate the case and to make a decision whether to prosecute' or . . . 'could at least have alerted law-enforcement authorities to the likelihood of wrongdoing.'" *Davis*, 679 F.3d at 836 (quoting *Springfield Terminal*, 14 F.3d at 654). The Iceland Memo therefore publicly discloses the price differential, and the transaction alleged here was based upon this publicly disclosed information.

2.

Oliver also argues that Philip Morris did not publicly disclose that it falsely certified compliance with the MFC provisions. Oliver does not dispute that the contracts containing the MFC provisions were publicly disclosed. Instead, he contends that because nothing in the MFC provisions themselves specifically states that Philip Morris's compliance was false, the contracts containing the MFC provisions do not publicly disclose that Philip Morris falsely certified compliance.

We agree with the District Court that because the MFC provisions were incorporated by reference into every contract, "a hypothetical government investigator aware of the price discrepancies and the MFC provisions would be 'alerted . . . to the likelihood' that the vendor was falsely certifying compliance with the relevant provisions." *Oliver*, 101 F. Supp. at 126 (quoting *Settlemire*, 198 F.3d at 918). Oliver's allegation of fraud is itself based upon the MFC provisions' incorporation by reference into each

contract with the Exchanges. The allegation "is not based on [his] direct knowledge of [Philip Morris's] scienter or lack thereof. Rather, it is an inference drawn from the available facts . . . ." *Cause of Action v. Chicago Transit Auth.*, 815 F.3d 267, 281 (7th Cir. 2016). Because the MFC provisions are incorporated by reference into the Exchanges' contracts, a price differential disadvantageous to the government, combined with a contract term certifying that Philip Morris would sell cigarettes at the best possible price, would enable the government to adequately investigate the case and make a decision whether to prosecute. *See Davis*, 679 F.3d at 836; *see also Cause of Action*, 815 F.3d at 281 (relator's allegations were based upon publicly disclosed information because, *inter alia*, "the Government was in an identical position to infer scienter from the publicly disclosed" documents). Accordingly, Oliver's allegation of false compliance is based upon the publicly disclosed MFC provisions.

B.

Although we conclude that the transactions that give rise to an inference of fraud were publicly disclosed, the jurisdictional bar operates only if the public disclosure occurs through certain channels specified in the statute. The statute specifies that public disclosure must occur in, *inter alia*, "a criminal civil or administrative hearing, in a congressional, administrative, or Government Account Office report . . . or from the news media." 31 U.S.C. § 3730(e)(4)(A). If the public disclosure did not occur through a statutorily enumerated channel, the jurisdictional bar does not operate. *See id.* Originally, the District Court concluded that the Iceland Memo was disclosed through two FCA channels: in a civil hearing, and in the news media. *Oliver*, 949 F. Supp. 2d at 245-47. When Philip Morris introduced the MFC

provisions on remand, the District Court also concluded that the MFC provisions were publicly disclosed through administrative reports and the news media. *Oliver*, 101 F. Supp. 3d at 124-25. After reviewing the record, we conclude that the Iceland Memo was disclosed in a civil hearing and the MFC provisions were disclosed in an administrative report.

1.

Oliver first argues that the Iceland Memo was not disclosed in a civil hearing. In *Springfield Terminal*, we held that "discovery material, when filed with the court (and not subject to protective order), is publicly disclosed in a civil hearing for purposes of § 3740(e)(4)(A)'s jurisdictional bar." 14 F.3d at 652. We further explained that "[i]t is clear from statutory context that the term 'hearing' was intended to apply in a broad context of legal proceedings under § 3740(e)(4)(A)," and "that for purposes of § 3740(e)(4)(A), 'hearing' is roughly synonymous with 'proceeding.'" *Id.* We limited our interpretation to "discovery material . . . which is *actually* made public through filing, as opposed to discovery material which has not been filed with the court and is only *theoretically* available upon the public's request." *Id.* We read the statute to require actuality because "[i]f [discovery materials] are not yet in the public eye, no rational purpose is served—and no 'parasitism' deterred—by preventing a *qui tam* plaintiff from bringing suit based on their contents." *Id.* at 653.

Oliver argues that *Springfield Terminal* requires materials to be filed *with the court* to constitute the type of public disclosure contemplated by the statute. According to Oliver, the Iceland Memo was originally published online pursuant to a settlement agreement that required Philip Morris to include documents that were produced in litigation. Philip Morris

produced the Iceland Memo in subsequent litigation, and it was placed in this previously-established online database. When the subsequent litigation ended, "the district court, as part of its final judgment, ordered [Philip Morris], among others, to maintain an 'Internet Document Website' until September 1, 2016, which was to include, among other things, the documents previously placed in its [settlement] database." Reply Br. at 25. Based on this timeline, and because the Iceland Memo was not filed with the court, Oliver contends it was not publicly disclosed in a civil hearing.

Oliver reads the statute and *Springfield Terminal* too narrowly. We noted in *Springfield Terminal* that the FCA's jurisdictional bar reflects "congressional efforts to walk a fine line between encouraging whistle-blowing and discouraging opportunistic behavior." 14 F.3d at 651. Accordingly, we analyzed the jurisdictional bar "in the context of these twin goals of rejecting suits which the government is capable of pursuing itself, while promoting those which the government is not equipped to bring on its own." *Id.* Furthermore, we explained that "[i]t is clear from statutory context that the term 'hearing' was intended to apply in a broad context of legal proceedings under § 3730(e)(4)(A)." *Id.* at 652. Given the goals of the statute and the "broad context" of a civil hearing, materials that a court order mandated be publicly accessible, and were in fact made publicly accessible as a result of that order, constitute materials disclosed in a civil hearing for purposes of the FCA's jurisdictional bar.

Although Oliver acknowledges that the Iceland Memo was publicly accessible via the internet, he contends that the history of the Iceland Memo's publication undermines the notion that it was "actually" publicly available. The database contains 4,480,485 documents from an additional 421 cases. Reply Br. at 26. Because *Springfield Terminal* distinguished

between "theoretically available" and "actually available," Oliver contends that the breadth of the database shows that the Iceland Memo was only theoretically available. We disagree. Although Oliver couches his argument in terms of whether the documents are "actually available," he effectively argues that public disclosure should turn on whether the documents are reasonably likely to be discovered. This is not the standard. The Iceland Memo was in fact actually available on a court-ordered public website. Because they were made available on the website in a civil hearing, they were "actually" made available in accordance with *Springfield Terminal*'s rationale.[7]

2.

Oliver also argues that the MFC provisions were not publicly disclosed in an administrative report. Because the provisions did not "give information" but were the "information itself," Oliver contends that the MFC provisions could not constitute a report. Appellant Br. at 42-44.

In *Schindler Elevator Corp. v. United States ex rel. Kirk*, the Supreme Court explained that the "ordinary meaning" of "report is something that gives information or a notification, or an official or formal statement of facts or proceedings." 563 U.S. 401, 407 (2011) (internal citation, quotation marks, and alterations omitted). The Court reasoned that "[t]his broad ordinary meaning of 'report' is consistent with the generally broad scope of the FCA's public disclosure bar." *Id.* In this case, the website provides information on how to contract with the Exchanges, and it attaches, via hyperlink,

---

[7] Because we hold that the Iceland Memo was publicly disclosed in a civil hearing, we need not reach whether it was also disclosed from the news media.

the terms and conditions of doing so. J.A. 349. The website and linked PDF file clearly "give[] information or a notification, or an official or formal statement of facts," *Schindler*, 563 U.S. at 407 (internal citation, quotation marks, and alterations omitted). Considering *Schindler*'s broad definition of "report," the website and the MFC provisions were disclosed in an administrative report, triggering the jurisdictional bar.[8]

C.

Although we conclude that the transactions Oliver alleges were publicly disclosed through statutorily prescribed channels, we would still have jurisdiction if Oliver qualifies as an "original source." 31 U.S.C. § 3730(e)(4)(B). An original source must have "direct and independent knowledge of the information on which the allegations are based." *Id.* "'Direct' signifies 'marked by absence of an intervening agency.'" *Springfield Terminal*, 14 F.3d at 656 (quoting *Houck v. Folding Carton Admin. Comm.*, 881 F.2d 494, 505 (7th Cir. 1989)). In other words, "[i]n order to be 'direct,' the information must be *first-hand knowledge*." *Findley*, 105 F.3d at 690 (emphasis added). "'Independent knowledge' is knowledge that is not itself dependent on public disclosure." *Springfield Terminal*, 14 F.3d at 656; *see also Findley*, 105 F.3d at 690 ("[A] person who learns of fraud from a public disclosure can never be an 'original source.'"). The relator must "possess direct and independent knowledge of the 'information' underlying the allegation, rather than direct and independent knowledge of the 'transaction' itself." *Springfield Terminal*, 14 F.3d at 656; *see also Rockwell Int'l*

---

[8] Once again, because we conclude that the MFC provisions were publicly disclosed in an administrative report, we need not reach whether they were also disclosed from the news media.

*Corp.*, 549 U.S. at 473 ("[T]he phrase 'information on which the allegations are based' refers to the relator's allegations and not the publicly disclosed allegations."). Notably, this is distinct from the knowledge of the "*combination* of X and Y" and rather "refers to direct and independent knowledge of *any* essential element of the underlying fraud transaction." *Springfield Terminal*, 14 F.3d at 657. In other words, if Oliver has direct and independent knowledge of information underlying X or Y, he qualifies as an original source.[9]

Here, Oliver contends that he is an original source for information underlying the X term: the fact that Philip Morris was selling cigarettes to other purchasers at prices lower than that which it sold cigarettes to the Exchanges. On remand, Oliver submitted a sworn declaration outlining how he came to possess the information underlying his allegation of fraud. J.A. 448-57. Oliver explained that his company, Medallion, sold cigarettes to military exchanges located in the United States. Oliver spoke with Tim Maloney, the tobacco category buyer for NEXCOM, about overseas pricing. Maloney informed Oliver that the overseas price was the domestic price less the amount of federal excise taxes. Oliver informed Maloney that he "believed" two additional domestic surcharges would not apply to overseas pricing, which was based on his status as a market participant and his knowledge of the 1998 Master Settlement Agreement ("MSA") between tobacco companies and attorneys general of 46 states. Maloney revealed that other overseas suppliers, including

---

[9] Philip Morris argues that Oliver was required to plead original source allegations in his operative complaint, and having failed to do so, he cannot claim original source status now. We need not reach this issue because we conclude the statements in Oliver's declaration viewed in conjunction with the allegations of the complaint do not establish that Oliver is an original source under the FCA.

Philip Morris, did not deduct these additional surcharges. Based on Maloney's response, Oliver investigated whether the additional surcharges were not applicable overseas, contacting the National Association of Attorneys General's ("NAAG") Tobacco Control Group, which administered the settlement agreement imposing the additional surcharges. NAAG and additional "industry contacts, including duty-free operators and overseas distributors" confirmed that the surcharges did not apply overseas. Oliver Decl. ¶ 7, J.A. 451. One of his contacts was Kenny Hasegawa, a co-owner of a duty-free business in Samoa which was in a market served by the Exchanges, who confirmed that the cigarettes sold to the Exchanges were identical to those sold to other overseas outlets. As a result, Oliver argues that he possesses direct knowledge of two kinds of information underlying Philip Morris's price differential: 1) his knowledge of the industry practice based on the terms of the MSA, and 2) the information he gained from his investigation into Philip Morris's overseas sales practices. We disagree.

The allegations in Oliver's complaint and the statements made in his declaration fail to demonstrate that Oliver qualifies as an original source. Oliver's knowledge of the information underlying the allegation of fraud in the complaint is not "direct" because Oliver possessed no first-hand knowledge of Philip Morris's unlawful price differential, but rather gained all his knowledge second-hand. Oliver argues that "the fact that a relator undertakes investigatory efforts does not prevent the information derived from that investigation from being 'direct.'" Appellant Br. at 57-58. However, it is not Oliver's investigation but his lack of first-hand knowledge prompting his investigation that precludes his original source status.

Our Circuit has found a relator who conducts an investigation to be an "original source," but only where the relator possessed some direct knowledge of the conduct implicated by the fraud. For example, in *Springfield Terminal*, we held that a relator who conducted investigatory efforts was an "original source" under § 3730(e)(4)(B). 14 F.3d at 657. There, the relator had participated in a prior federal action related to an arbitration dispute under the Railway Labor Act. *Id.* at 647. In seeking to set aside the arbitration award, the relator obtained the arbitrators' pay vouchers during discovery and realized that the arbitrators billed the government for "activities unrelated to the arbitration proceedings." *Id.* The relator thereafter filed a *qui tam* complaint, alleging that the arbitrator had billed the government for days he had not worked on the proceeding. *Id.* at 648. The relator's "suspicions first arose upon inspection of [the] pay vouchers" because, "[b]ased upon its own involvement in the arbitration," the relator knew that the arbitrator had no work to perform on days he billed the government. *Id.* The relator "then conducted further investigation on its own" by calling numbers listed on the arbitrator's telephone records, which revealed that the arbitrator had been out of the country for personal reasons for which he had billed the government. *Id.*

We held that it was "beyond question" that the relator was an original source. *Id.* at 657. "[T]he pay vouchers and phone records did not themselves suffice to indicate fraud." *Id.* As a result, the relator "bridged the gap by its own efforts and experience, which in th[at] case included personal knowledge of the arbitration proceedings *and* interviews with individuals and businesses identified in the telephone records." *Id.* (emphasis added). The relator "started with innocuous public information; it completed the equation with information independent of any preexisting public

disclosure." *Id.* The relator's personal knowledge of the arbitration proceedings shows that "a relator need not have first-hand knowledge of *all* of the information supporting his allegations, but he must have at least *some* first-hand knowledge of that information." *U.S. ex rel. Antoon v. Cleveland Clinic Found.*, 788 F.3d 605, 621 (6th Cir. 2015) (Gibbons, J., concurring) (citation omitted).

*Springfield Terminal* thus demonstrates that in order to have "direct" knowledge for purposes of the original source exception, a relator must have some first-hand knowledge that would lead him to believe that a fraud had been committed. Cases from other circuits confirm this approach. For example, in *Minnesota Association of Nurse Anesthetists v. Allina Health Systems Corp.*, the Eighth Circuit held that the relator organization's members had direct knowledge because they witnessed the fraudulent conduct of filling out billing forms with misleading information. 276 F.3d 1032, 1050 (8th Cir. 2002). The members also had direct knowledge of the "true state of facts" contradicting the fraud because they had witnessed the actual conduct that the fraud misrepresented. *Id.* Likewise, in *Cooper v. Blue Cross & Blue Shield*, the relator's own insurance claims prompted him to conduct research that led to allegations of Medicare fraud against his insurance company. 19 F.3d 562, 564-65 (11th Cir. 1994) (per curiam). The Eleventh Circuit held that the jurisdictional bar did not apply because the relator had direct knowledge of the fraud through "years of his own claims processing, research, and correspondence with members of Congress and [the federal agency]." *Id.* at 568. Finally, in *United States ex rel. Bahrani v. Conagra, Inc.*, the Tenth Circuit held that a relator's affidavit "stating that he personally observed" the fraudulent conduct precluded summary judgment on whether he qualified as an original source. 465 F.3d 1189, 1209 (10th Cir. 2006); *see also U.S. ex rel. Bahrani v. Conagra, Inc.,* 624

F.3d 1275, 1287-88 (10th Cir. 2010) (relator "had to establish he was 'personally aware of at least one instance of [a] fraudulent' certificate change" (quoting *Glaser v. Wound Care Consultants, Inc.*, 570 F.3d 907, 921 (7th Cir. 2009))); *U.S. ex rel. Lam v. Tenet Healthcare Corp.*, 287 F. App'x 396, 400 (5th Cir. 2008) ("Relators found to have direct and independent knowledge are those who actually viewed source documents or viewed first hand the fraudulent activity that is the basis for their qui tam suit."). *But see Antoon*, 788 F.3d at 618 ("[T]here is nothing in the statutory text that limits 'direct knowledge' to first-hand knowledge.").

Similarly, our sister circuits have routinely held that relators do not qualify for the original source exemption where the relator learns of the fraudulent activity from a third party. In *Glaser v. Wound Care Consultants, Inc.*, the relator alleged that a medical facility committed Medicaid fraud when it billed Medicaid for services performed by a doctor that were actually performed by a nurse practitioner or physician's assistant, which would have resulted in a lower rate. 570 F.3d at 911-12. The Seventh Circuit concluded the relator was not an original source despite her knowledge that a nurse practitioner treated her because "the fraud alleged pertain[ed] to the billing, not the treatment," and "she had *no knowledge whatsoever* of the fraudulent conduct before hearing from an attorney." *Id.* at 921.

In *United States ex rel. Ondis v. City of Woonsocket*, in response to the mayor's statements that he would do away with all section 8 housing, the relator investigated whether the city illegally received federal grants from the Department of Housing and Urban Development. 587 F.3d 49, 52 (1st Cir. 2009). The relator alleged fraud based on "specific instances . . . previously disclosed in daily newspapers of general circulation" or otherwise "unarguably . . . from the public

domain." *Id.* The First Circuit concluded that the relator lacked direct knowledge because "[k]nowledge that is based on research into public records, review of publicly disclosed materials, or some combination of these techniques is not direct." *Id.* at 59.

Finally, the Fourth Circuit also found such mediated knowledge insufficient for original source status in *United States ex rel. Grayson v. Advanced Management Technology, Inc.*, 221 F.3d 580 (4th Cir. 2000). In *Grayson*, the relators were lawyers who had represented a company in a dispute about the award of a government contract. *Id.* at 581. In the course of the representation, the relators learned that the company that had been awarded the contract misrepresented the makeup of the personnel who would perform the contract. *Id.* at 581-82. Relators filed a *qui tam* action, alleging that such misrepresentations violated the FCA. *Id.* at 582. The Fourth Circuit concluded that relators were not an original source because they "at best verified" the information contained in an administrative protest. *Id.* at 583.

With these principles in mind, we "look to the factual subtleties of the case before [us] and attempt to strike a balance between those individuals who, with no details regarding its whereabouts, simply stumble upon a seemingly lucrative nugget and those actually involved in the process of unearthing important information about a false or fraudulent claim." *U.S. ex rel. Laird v. Lockheed Martin Eng'g & Sci. Servs. Co.*, 336 F.3d 346, 356 (5th Cir. 2003), *abrogated on other grounds by Rockwell Int'l Corp.*, 549 U.S. at 472. Here, Oliver possesses no direct knowledge of information that prompted his investigation into Philip Morris. Unlike the litigants in *Springfield Terminal*, who possessed first-hand knowledge of the days on which the arbitrator conducted proceedings, Oliver does not allege any direct knowledge of

transactions involving Philip Morris.  Oliver does not allege that he worked for Philip Morris, sold cigarettes overseas on behalf of Philip Morris, or purchased cigarettes overseas from Philip Morris.  He learned of Philip Morris's sales practices from Maloney, a third party.  Maloney's knowledge prompted Oliver to investigate whether the surcharges applied.  Because Oliver stumbled upon Philip Morris's overseas pricing when a third party revealed the pricing to him, he does not possess direct information underlying Philip Morris's unlawful price differential.

Furthermore, neither Oliver's background information nor the knowledge he gained through his investigation constitutes direct information sufficient to confer original source status.  "Courts must be mindful of suits based only on 'secondhand information, speculation, background information or collateral research.'"  *U.S. ex rel. Atkinson v. PA. Shipbuilding Co.*, 473 F.3d 506, 523 (3d Cir. 2007) (quoting *U.S. ex rel. Hafter D.O. v. Spectrum Emergency Care, Inc.*, 190 F.3d 1156, 1162-63 (10th Cir. 1999)).  The FCA was intended to encourage "those 'who are either *close observers* or *otherwise involved* in the fraudulent activity' to come forward."  *U.S. ex rel. Barth v. Ridgedale Elec., Inc.*, 44 F.3d 699, 703-04 (8th Cir. 1995) (quoting S. Rep. No. 99-345, at 4 (1986), *as reprinted in* 1986 U.S.C.C.A.N. 5266, 5269).  Recognizing Oliver's background knowledge of the MSA and his contact with NAAG and Hasegawa as direct would undermine this intent, as Oliver was not a close observer of any of these facts.  *Cf. Atkinson*, 473 F.3d at 523 (finding relator was not an original source because "[a]ny member of the public could have" checked the public records underlying the *qui tam* suit).  Accordingly, because Oliver lacks any direct information about the price differential Philip Morris charged the Exchanges, he is not an original source.

24

\*\*\*

Because the transactions creating an inference of fraud were publicly disclosed and Oliver is not an original source, we affirm the judgment of the District Court.

*So ordered.*