# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued September 25, 2024      Decided August 12, 2025

No. 23-7139

UNITED STATES OF AMERICA, EX REL. TERRI R. WINNON,
AND
STATE OF TEXAS, EX REL. TERRI R. WINNON,
AND
TERRI R. WINNON,
APPELLANT

v.

RAMIRO G. LOZANO, JR., ET AL.,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:17-cv-02433)

———

*Kendal C. Simpson* argued the cause for appellant. With her on the briefs were *Joshua M. Russ*, *Brett S. Rosenthal*, *Allison N. Cook*, *Rachel Veronica Rose*, and *Patricia Ryan*.

*Luke V. Cass* argued the cause for appellees Lozano, et al. With him on the brief were *Joe D. Whitley* and *M. Rhett DeHart*.

*Kathleen McDermott* argued the cause for appellee RehabCare Group East, LLC. With her on the brief were *Kayla Stachniak Kaplan* and *Meredith S. Auten.*

Before: KATSAS and CHILDS, *Circuit Judges*, and EDWARDS, *Senior Circuit Judge.*

Opinion for the Court filed by *Circuit Judge* CHILDS.

Opinion concurring in part and dissenting in part filed by *Circuit Judge* KATSAS.

CHILDS, *Circuit* Judge:  The False Claims Act is the federal government's sword against fraud.  At the heart of the Act lies the *qui tam* provision, which deputizes private individuals, known as relators, to expose fraudulent schemes targeting federal programs in exchange for a share of any recovery.  31 U.S.C. § 3730(d).  Medicare and Texas Medicaid, which use federal funding to provide medical services for persons with disabilities, the elderly, and low-income individuals— including those admitted to skilled nursing facilities—are frequent targets of such schemes.

This *qui tam* action arises from allegations by Relator Terri R. Winnon that seventeen defendants flouted the False Claims Act and the Texas Medicaid Fraud Prevention Law by scheming their way to improper reimbursements.  In her view, the defendants paid off doctors and hospital discharge planners for patient referrals to skilled nursing facilities and also inflated bills with superfluous therapy services.  The district court found these claims either barred by the Act's public disclosure provision or too thinly pleaded to satisfy Federal Rule of Civil Procedure 9(b).

On appeal, Winnon presses two points: that she qualifies as an original source and that her allegations satisfy Rule 9(b). Were she correct on both counts, a remand and reinstatement of her state law claims might follow. But she fails to meet the original source requirement. And though her allegations come close under Rule 9(b), they fall short.[1] We therefore affirm.

## I.

### A.

The False Claims Act (FCA or the Act), originally enacted as the Informer's Act in 1863,[2] was a Civil War-era response to rampant fraud against the Union Army. *See United States v. Bornstein*, 423 U.S. 303, 309 (1976). Dormant for decades, the Act was first amended by Congress in 1986, making it the government's primary weapon against fraud. Pub. L. No. 99-562, 100 Stat. 3153. A subsequent amendment in 2010 extended the Act's reach to combat health care fraud. Patient Protection and Affordable Care Act, Pub. L. No. 111-148, § 10104, 124 Stat. 119, 901–02 (Mar. 23, 2010).

Winnon's appeal involves a presentment claim brought under the FCA. For this provision, liability attaches to anyone who "knowingly presents, or causes to be presented, a false or fraudulent claim [to the government] for payment or approval." 31 U.S.C. § 3729(a)(1)(A). The term "knowingly" includes "actual knowledge," "deliberate ignorance," and "reckless

---

[1] Our colleague partially dissents. He would reverse the district court's dismissal of Winnon's claim that certain defendants induced local doctors and hospital discharge planners with marketing gifts.

[2] Act of Mar. 2, 1863, ch. 67, 12 Stat. 696 (codified as amended at 31 U.S.C. § 3729 *et seq.*).

disregard" of the information. *Id.* § 3729(b)(1)(A)(i-iii). A "claim" includes any request for payment involving federal funds or programs. *Id.* § 3729(b)(2)(A).

The FCA often overlaps with the Anti-Kickback Statute (AKS) and the Self-Referral Law (Stark Law), which provide substantive bases for liability. The AKS prohibits knowing and willful solicitation or receipt of remuneration in return for referrals for federally reimbursed services. 42 U.S.C. § 1320a-7b(b)(1)(A). "Remuneration" encompasses anything of value, including payments or services below fair market value. *Id.* § 1320a-7a(i)(6). The Stark Law, in turn, bars physicians from referring Medicare patients to entities with which they have a financial relationship absent specific exceptions. *Id.* § 1395nn(a)(1)(A). A financial relationship is defined broadly to include ownership interests or compensation arrangements. *Id.* § 1395nn(a)(2), (h)(1).

Winnon's *qui tam* action also invoked tantamount Texas state law claims alongside her FCA presentment claim. The Texas Medicaid Fraud Prevention Law ("TMFPL"), Tex. Hum. Res. Code Ann. § 36.001 *et seq.*, criminalizes common forms of fraud, such as "knowingly mak[ing] or caus[ing] to be made a false statement or misrepresentation of a material fact to permit a person to receive a benefit or payment" that is unauthorized or greater than authorized, *id.* § 36.002(1). Fraudulent conduct also runs afoul of the Texas Human Resources Code – Medical Assistance Program ("MAP"), *id.* § 32.039(b), and the Texas Patient Solicitation Act ("TPSA"), which prohibits the solicitation of patients and the submission of claims for reimbursement by Texas Aid.[3] Tex. Occ. Code Ann. § 102.001 *et seq.*

---

[3] The TMFPL, MAP, and TPSA hereinafter are collectively referred to as "Texas Law."

5

**B.**

Medicare, created under Title XVIII of the Social Security Act (SSA), provides health insurance primarily to individuals aged sixty-five and older, as well as certain individuals with disabilities. *See* 42 U.S.C. § 1395c. Similarly, Title XIX of the SSA establishes the Texas Medicaid Program, which offers medical assistance through a partnership jointly funded and administered by Texas and the federal government. *See* 42 U.S.C. §§ 1396 *et seq.*

Medicare governs reimbursement for services provided in skilled nursing facilities (SNF) through two distinct Parts. Part A covers short-term inpatient care, *id.* § 1395y(a)(1)(A), while Part B covers ancillary services such as therapy, *id.* §§ 1395j–1395w-6. To safeguard program integrity, reimbursement under both Parts, and Texas Medicaid, is strictly limited to services deemed "reasonable and necessary." *Id.* § 1395y(a)(1)(A); *see id.* §§ 1320c-5(a)(1), 1395j–1395w-6, 1396 *et seq.*

Medicare contractors, known as fiscal intermediaries, bear the responsibility for processing claims, auditing payments, and ensuring compliance with federal regulations established by the Centers for Medicare & Medicaid Services (CMS). *See* 42 U.S.C. § 1395h; 42 C.F.R. § 421.5. Providers, for their part, must certify compliance when submitting claims, enrollment forms, and cost reports. *See* 42 C.F.R. § 413.24(f)(4)(iv). That includes furnishing sufficient information to determine the amount due and ensure claims comply with Medicare regulations. *See id.* § 424.5(a)(5). Fraudulent claims, including those tainted by violations of the AKS or the Stark Law, can trigger liability under the FCA.

6

## C.

Ramiro Lozano Jr. and his business partner, Jay Balentine, jointly own, operate, and control eight SNFs across Texas.[4] Terri R. Winnon is a former math teacher with no prior experience in health care accounting who began working as an assistant to Lozano in January 2009. Over time, Lozano promoted her to Executive Assistant and Controller, granting her access to the financial operations of the SNFs under his control. While familiarizing herself with the facilities' practices, Winnon noticed irregularities that raised questions about the integrity of Medicare and Medicaid reimbursements.

After raising these concerns directly with Lozano, Winnon was terminated in February 2016. She subsequently filed this *qui tam* action under seal in November 2017 and amended her complaint twice, eventually naming seventeen defendants, including Lozano, Balentine, eight SNFs (together, the SNF Defendants), RehabCare Group East, LLC (RehabCare), and six physicians (Physicians). Winnon says the defendants collectively orchestrated a scheme to maximize profits by exploiting Medicare and Texas Medicaid in violation of the FCA and Texas Law.

---

[4] The SNFs include: RJ Meridian Care Alta Vista, LLC (RJ Alta Vista), RJ Meridian Care of Galveston, LLC (RJ Galveston), RJ Meridian Care of Alice, Ltd. (RJ Alice), RJ Meridian Care of Hebbronville, Ltd. (RJ Hebbronville), and RJ Meridian Care of San Antonio, Ltd. (RJ San Antonio). In addition, Lozano serves as the registered agent for three facilities owned by other entities: Meridian Care of San Antonio III, LLC (San Antonio III), Spanish Meadows of Katy, Ltd. (Katy Facility), and Empire Spanish Meadows, Ltd. (Empire Spanish Meadows).

**1.**

Winnon's first set of allegations concern a "kickback" scheme—money exchanged for patient referrals. She claims that SNF Defendants paid unlawful remuneration through three channels: employee bonuses to increase Medicare patient numbers, "sham" medical directorships, and "marketing gifts" to hospital discharge planners. First, she says SNF Defendants offered bonuses to employees who hit Medicare census targets. As support, she references that employee "A.M." became eligible for "census" pay on January 1, 2015, and, per a February 1, 2016, email from Lozano, received a $1,000 bonus in April 2016 for meeting the goal.

Next, Winnon highlights Lozano's relationships with doctors at SNFs under his watch. She recalls him discussing dinners with physicians, including one in Brownsville, Texas, after which he returned to the corporate office in Spring, Texas, and expressed hope that he had "secured" another doctor. She then points to invoices from January 2013 to May 2015 reflecting static monthly payments—$1,200, $1,500, $2,500, or $3,000—to four medical directors at Empire Spanish Meadows. In her view, these payments were made without written compensation agreements specifying the medical directors' pay or duties, and the invoices themselves were quite literally blank, listing no descriptions of services rendered.

According to Winnon, those four medical directors pocketed $160,000 over two and a half years, and a fifth was added by late 2015—an oddity, given that Empire Spanish Meadows had fewer beds than the Katy Facility but somehow needed more medical directors. She asks the court to infer that the additional medical directors were being paid for something other than legitimate services. And, as a final accusation, she notes that the Katy Facility was simultaneously paying one

medical director $2,000 per month while also shelling out $3,000 per month to the same person as a "nursing consultant."

Finally, Winnon claims that from 2013 through May 2015, Empire Spanish Meadows funneled thousands of dollars to hospital discharge planners under the guise of "marketing gifts"—including, among other things, alcohol, food, and advertisements—to ensure a steady stream of patient referrals. And, in the end, Winnon alleges that these improper payments violated both the AKS, the Stark Law, and Texas Law.

**2.**

Winnon's second set of allegations target the manipulation of therapy services by RehabCare, a contracted therapy provider for the SNFs. Once Lozano's facilities admitted referred hospital patients, RehabCare allegedly billed for therapy services, and the SNFs, in turn, sought Medicare reimbursements using the Resource Utilization Group (RUG) classification system.[5] Winnon contends that RehabCare systematically gamed this system by artificially inflating patient therapy hours and intensity to push patients into higher

---

[5] The RUG-IV classification system includes 66 payment coding levels for SNF patients, divided into eight categories— two for therapy services and six for "little or no therapy." Patients are assigned a three-character code based on their care requirements. The first character represents therapy services; the second character indicates the level of therapy required each week (e.g., physical, occupational, or speech therapy); and the third character reflects the patient's minimum activity of daily living (ADL) score. Daily payment rates generally increase for therapy RUGs compared to non-therapy RUGs, for higher amounts of weekly therapy, and for higher ADL scores or more extensive services.

RUG categories, maximizing reimbursement. For example, the Katy Facility allegedly billed 81.8% of its patients at the Ultra-High therapy level in 2014, a figure that landed it in the top 1% of SNFs nationwide. In her eyes, these padded invoices from RehabCare did not stop there—they were passed up the chain to the government through the SNFs' reimbursement claims.

However, Winnon faces the challenge of distinguishing her allegations from those aired in the *Halpin* action, a prior health care fraud suit. *See United States ex rel. Halpin & Fahey v. Kindred Healthcare, Inc.*, No. 11-12139-RGS (D. Mass.). After the United States and Texas declined to intervene in Winnon's *qui tam* suit, the district court unsealed portions of the *Halpin* complaint. That complaint revealed RehabCare's marching orders to its program directors: assign Ultra-High RUG levels to all new patients—without regard to clinical need—because higher reimbursements meant higher profits. Winnon, for her part, claims the scheme did not stop there, but spread to several SNFs, including RJ Alice, RJ Hebbronville, and RJ Galveston, where RehabCare systematically steered patients into inflated RUG levels.

Each group of defendants moved to dismiss, arguing that Winnon's claims failed under the FCA's public disclosure bar, 31 U.S.C. § 3730(e)(4), or did not meet the heightened pleading requirements of Rule 9(b). J.A. 1105–43. The district court dismissed Winnon's allegations against RehabCare, finding they were previously disclosed to the public in the *Halpin* action. *See United States v. Lozano*, No. 17-2433, 2023 WL 6065161, at *1 (D.D.C. Sep. 18, 2023). The district court also dismissed Winnon's allegations against the SNF Defendants for failing to meet Rule 9(b)'s particularity requirements. *See United States v. Lozano*, No. 17-2433, 2023 WL 6065162, at *1 (D.D.C. Sep. 18, 2023). Winnon timely appealed all rulings except those against the Physicians. J.A. 1144–46.

## II.

We have jurisdiction to review. 28 U.S.C. § 1291. We review the district court's dismissal of a complaint for failure to state a claim de novo. *See United States ex rel. Shea v. Cellco P'ship*, 863 F.3d 923, 932 (D.C. Cir. 2017). We view the facts in the light most favorable to Relator Terri R. Winnon as required at this stage. *United States ex rel. Heath v. AT&T, Inc.*, 791 F.3d 112, 117 (D.C. Cir. 2015) (citing *Navab–Safavi v. Glassman*, 637 F.3d 311, 318 (D.C. Cir. 2011)).

To survive a motion to dismiss, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is "plausible on its face" when the pleaded facts allow the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* While this standard does not amount to a "probability requirement" it does require "more than a sheer possibility that a defendant has acted unlawfully." *Id.* The court "assumes the truth of all well-pleaded factual allegations in the complaint and construes reasonable inferences from those allegations in the plaintiff's favor." *Sissel v. U.S. Dep't of Health & Hum. Servs.*, 760 F.3d 1, 4 (D.C. Cir. 2014).

## A.

We turn first to the district court's dismissal of Winnon's claims against RehabCare.[6] The public disclosure bar is a two-part test that is simple in form yet often intricate in application.

---

[6] We decline to address supplemental jurisdiction over any remaining state law claims because Winnon's FCA claims against RehabCare are federal. *See* 28 U.S.C. § 1367(c)(3).

First, we ask whether the allegations or transactions are "substantially similar" to publicly disclosed information. *See Shea*, 863 F.3d at 933. If so, the inquiry shifts to whether the relator qualifies as an "original source." *See United States ex rel. Davis v. D.C.*, 679 F.3d 832, 835–36 (D.C. Cir. 2012); *United States ex rel. Springfield Terminal Ry. Co. v. Quinn*, 14 F.3d 645, 651 (D.C. Cir. 1994).

Before 2010, the public disclosure bar was jurisdictional, depriving courts of authority to hear claims based on previously disclosed fraud. 31 U.S.C. § 3730(e)(4)(A) (1986). However, we clarified in *United States ex rel. O'Connor v. USCC Wireless Inv., Inc.*, 128 F.4th 276, 284–85 (D.C. Cir. 2025), that the 2010 amendments removed this jurisdictional restriction, making the bar an affirmative defense that must be asserted by the defendant and may be opposed by the government. *Accord Csepel v. Republic of Hungary*, 714 F.3d 591, 608 (D.C. Cir. 2013).

**1.**

We conclude that RehabCare sufficiently raised an affirmative defense because Winnon's RUG upcoding allegations were publicly disclosed in the *Halpin* action. The parties do not dispute that the public disclosure bar mandates dismissal when "substantially the same allegations or transactions" have already been disclosed in a federal "civil . . . hearing . . . report . . . or news media" publication where the government [or] its agent is a party. *See* 31 U.S.C. § 3730(e)(4)(A)(i–iii). This provision shuts the courthouse door on "parasitic" lawsuits that add nothing to what is already public knowledge. *See Shea*, 863 F.3d at 926. Our inquiry asks whether the government has enough information to investigate, or whether the disclosure may have put law enforcement on the

trail of fraud? *See O'Connor*, 128 F.4th at 285 (citation omitted). If the answer to either question is yes: case closed.

The framework comes from *Springfield Terminal*: a "transaction" consists of multiple elements that, when combined, give rise to an inference of fraud. *See United States ex rel. Oliver v. Philip Morris USA Inc. (Oliver I)*, 763 F.3d 36, 40 (D.C. Cir. 2014) (citing *Springfield Terminal*, 14 F.3d at 654). Allegations of fraud require disclosure of all elements to invoke the public disclosure bar. *Id.* And if all elements are not disclosed publicly, a *qui tam* plaintiff may fill the gap by alleging the missing elements or directly asserting fraud. *Springfield Terminal*, 14 F.3d at 654–55.

FCA fraud follows a basic formula: the elements are "who, what, when, and where" detailing the circumstances of the fraud scheme. *Heath*, 791 F.3d at 124. The "who" is the fraudster; the "what" is the scheme itself; and, the "when" and "where" are the scheme's temporal and geographic coordinates. When these pieces come together, they form a complete picture—one sufficient to warrant an inference of fraud and, if disclosed early enough, avoid the public disclosure bar. *Springfield Terminal*, 14 F.3d at 654.

Here, every single element Winnon alleges was previously disclosed in the *Halpin* action. Her complaint alleges that RehabCare (who) "frequently claimed, without justification, to provide the highest and most expensive levels of care" (what) between 2009 and 2016 (when) at specific Texas SNFs (where), leading to the inference of systematic upcoding of Medicare claims submitted for reimbursement (FCA fraud). Meanwhile, the *Halpin* complaint alleged that RehabCare (who) submitted false Medicare claims (FCA fraud) for services that were unreasonable, unnecessary, or never provided (what) during the relevant period (when) at SNFs

nationwide (where). J.A. 401. In this case, the central actor is the same. The scheme is the same. The allegations are materially identical.

Winnon attempts to dodge the bar by nitpicking the "when" and "where." She says that identifying eight specific Texas facilities makes her case distinct because her facilities were excluded from the broader category of the roughly 498 SNFs detected in *Halpin*. Not so. We have long held that identifying additional examples of an already-exposed scheme does not breathe life into an otherwise barred claim. *See Davis*, 679 F.3d at 838. Because the *Halpin* complaint alleged that RehabCare's fraud spanned SNFs "across the United States"— which, in our view, includes Texas—Winnon's claim that *Halpin* did not name her facilities is without merit.

The same is true for Winnon's timeframe argument. The *Halpin* action addressed fraudulent conduct by RehabCare from January 1, 2009, to July 6, 2015. J.A. 275–82. Winnon's allegations, spanning January 2009 to February 2016, extend that window by a mere seven months. That is not a material distinction because time differences do not erase a disclosure of fraud. *See United States ex rel. Oliver v. Philip Morris USA Inc. (Oliver II)*, 826 F.3d 466, 473 (D.C. Cir. 2016) (explaining that time differences do not negate the disclosure of a general fraudulent practice); *see also United States ex rel. Schweizer v. Canon, Inc.*, 9 F.4th 269, 276 (5th Cir. 2021) (collecting cases) (affirming dismissal where allegations merely extended the timeframe and contributed "more of the same" without materially altering the fraudulent scheme (cleaned up)); *Bellevue v. Universal Health Servs. of Hartgrove, Inc.*, 867 F.3d 712, 720 (7th Cir. 2017) (finding allegations substantially similar where the fraud continued into subsequent years as part of a "continuing practice" and did not involve genuinely new or materially different information). When a fraud is disclosed

publicly, it is exposed—whether it lasted a day longer or a year longer does not change that fact.

Winnon's problems do not stop there. She concedes that a corporate integrity agreement (Agreement) existed between RehabCare and the U.S. Department of Health and Human Services Office of Inspector General (HHS/OIG), which was publicly available from January 22, 2016, to June 27, 2021. J.A. 611–53. That Agreement—qualifying as both an "audit" and "federal report" under the FCA—addressed the same misconduct and mandated RehabCare's compliance measures. *See, e.g.*, *United States ex rel. Maur v. Hage-Korban*, 981 F.3d 516, 522–24 (6th Cir. 2020); 31 U.S.C. § 3730(e)(4)(A)(ii). In short, the Agreement required RehabCare to audit SNF claims for "medical necessity"—the very same fraud Winnon alleges. *Compare* J.A. 648 *with* J.A. 55–56.

And if that weren't enough, Winnon herself acknowledges a government press release announcing the *Halpin* action settlement. J.A. 50. A press release from the government announcing the fraud is about as public as public can get. Together, these publicly available sources negate any claim that Winnon's allegations are not substantially similar.

Bottom line: The who, what, when, and where of Winnon's allegations are a retread of *Halpin*, minor differences notwithstanding. Because each of these elements were already disclosed in *Halpin*, Winnon's allegations neither lead to a new inference of fraud nor a novel assertion of the FCA fraud itself that was not already apparent to the government. That is enough to satisfy the *Springfield Terminal* test, triggering the public disclosure bar. One question remains—whether Winnon qualifies as an original source. We turn to that next.

15

**2.**

Once public disclosure is established, the burden shifts—by necessity and by law—to the relator to prove she qualifies as an original source. *See Smith v. United States*, 568 U.S. 106, 112 (2013) ("Where the facts with regard to an issue lie peculiarly in the knowledge of a party, that party is best situated to bear the burden of proof." (cleaned up)); *see also O'Connor*, 128 F.4th at 287. The statute provides two clear pathways to original source status: either the relator, before public disclosure, "voluntarily disclose[s] to the [g]overnment the information on which allegations or transactions . . . are based," or the relator "has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions, and . . . has voluntarily provided th[is] information to the [g]overnment before filing an action." 31 U.S.C. § 3730(e)(4)(B). The statute is explicit. The requirement is not flexible. And failure to meet either of these conditions is fatal. *See Davis*, 679 F.3d at 839 & n.4. Winnon meets neither.

Both pathways are closed because Winnon does not allege, with any specificity, that she voluntarily provided the relevant information to the government before the *Halpin* action or filing her *qui tam* suit. Instead, she recites the statutory elements as if saying them makes them so: she claims that a "written disclosure statement setting forth all material evidence and information Relator possesses has previously been submitted as required by 31 U.S.C. § 3730(b)(2)" and that she "complied with all conditions precedent to bringing this action." J.A. 13. In place of pleading facts, Winnon instead calls for legal conclusions. *See Twombly*, 550 U.S. at 555; *Iqbal*, 556 U.S. at 678. Even if we are charitable and assume she refers to the summary provider report on ultra-high therapy codes, J.A. 51, she still fails to allege *when* she disclosed it or

*to whom*. Those are not trivial omissions; they are the very facts that determine whether she clears the statutory bar. She does not.

Winnon also fails to allege that her knowledge was independent. She relies on publicly accessible data—such as provider summary reports and monthly facility data—which undermines any assertion of independent knowledge. *See Springfield Terminal*, 14 F.3d at 656 ("'Independent knowledge' is knowledge that is not itself dependent on public disclosure."). And Winnon's admission that this data is available nationwide eviscerates any assertion that she obtained this information independently. J.A. 52. At most, her complaint repackages publicly disclosed information, placing her squarely within the public disclosure bar. And mere repackaging is not enough. As we have held, "a relator cannot overcome the public disclosure bar by contributing 'speculation, background information or collateral research'" to existing public information. *Shea*, 863 F.3d at 934 (quoting *Oliver II*, 826 F.3d at 479). Winnon offers nothing to show her knowledge is truly independent—distinct from and materially additive to the public record—as required under the FCA. *See Oliver II*, 826 F.3d at 476.

Even assuming, *arguendo*, that she gathered the information independently, Winnon's allegations fail to materially add anything to the information disclosed in the *Halpin* action. In line with our sister circuits, we recently held that a "material addition" is information that is "sufficiently significant or essential" to influence the government's decision to prosecute. *O'Connor*, 128 F.4th at 288–89 (citing *United States ex rel. Winkelman v. CVS Caremark Corp.*, 827 F.3d 201, 211 (1st Cir. 2016)). That means a relator who "merely adds detail or color" to preexisting claims fails to meet this threshold. *Id.* at 18. At best, Winnon's references to new

timeframes and specific SNF locations amount to little more than additional examples of a scheme already disclosed in the *Halpin* action. These minor variations fail to materially alter the fraudulent scheme's core as revealed in *Halpin*.

The public disclosure bar prevents relators from repackaging publicly available information. Because Winnon's allegations do not materially alter what was already disclosed, and she neither alleges with specificity that she voluntarily provided the relevant information to the government before *Halpin* nor pleads when or to whom she disclosed it, she does not qualify as an original source. We therefore affirm the district court's dismissal of claims against RehabCare.

**B.**

We turn now to the district court's dismissal of Winnon's claims against SNF Defendants. This Court has long held that a *qui tam* plaintiff must properly allege fraud under Rule 9(b) to state a claim under the FCA. *See United States ex rel. Williams v. Martin-Baker Aircraft Co.,* 389 F.3d 1251, 1256 (D.C. Cir. 2004) (citing *United States ex rel. Totten v. Bombardier Corp.*, 286 F.3d 542, 551–52 (D.C. Cir. 2002)). Rule 9(b) requires a relator to "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). Particularity requires more than vague allegations and sweeping assertions. A complaint must provide enough detail to "guarantee all defendants sufficient information to allow for preparation of a response" by alleging the "time, place, and manner" of the fraud. *Heath*, 791 F.3d at 123 (citing *Martin-Baker Aircraft Co.,* 389 F.3d at 1256).

This does not mean, however, that a relator must list every fraudulent invoice. We have recognized that "precise details

of individual claims are not, as a categorical rule, an indispensable requirement of a viable [FCA] complaint." *Heath*, 791 F.3d at 126. But the rule is not an empty formality. A relator must still provide "particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." *Id.* (citation omitted). That is the bar, and it must be met to prevent litigation by ambush and to protect defendants from meritless accusations of fraud. *See id.*

Winnon's FCA claims fall into two categories: (1) allegations of unlawful remuneration under the AKS and the Stark Law, and (2) the RUG upcoding scheme.

**1.**

Winnon argues that SNF Defendants violated the AKS by providing remuneration to employees and hospital staff to induce patient referrals reimbursable by Medicare and Medicaid, and the Stark Law by paying medical directors. J.A. 26–37. At the outset, Winnon's claims fail on one fundamental point: the AKS and the Stark Law, do not in themselves, create private causes of action. Quite the reverse, these statutes are enforced exclusively by the government; no private individual—whether a *qui tam* relator or anyone else—may bring an action for their violation standing alone.

To be sure, the Justice Department may prosecute offenses under the AKS, subjecting offenders to criminal penalties, including up to ten years of imprisonment and fines as high as $100,000 per violation. *See* 42 U.S.C. § 1320a-7b(b). Liability attaches to any claim resulting from Section 1320a-7b(b), which "constitutes a false or fraudulent claim" *Id.* § 1320a-7b(g). Similarly, the OIG and CMS wield civil enforcement authority, capable of imposing treble damages, fines, and

exclusions from federal health care programs. *Id.* § 1320a-7a. The Stark Law, a strict liability statute, likewise provides for civil penalties and demands repayment for improperly reimbursed Medicare claims. *Id.* § 1395nn(g). But because these statutes do not authorize private suits, a relator has no standing to bring an action based purely on violations of the AKS or Stark Law.

That said, a *qui tam* relator may invoke the FCA as a vehicle for pursuing claims arising from AKS or Stark Law violations, but only when those violations result in the submission of false claims to the federal government. 31 U.S.C. § 3729(a)(1)(A). The Affordable Care Act solidified the connection between the AKS and the FCA, providing that "a claim that includes items or services resulting from a violation of [the AKS] constitutes a false or fraudulent claim" under the FCA. *See* 42 U.S.C. § 1320a-7b(g). Likewise, a Stark Law violation can trigger FCA liability under the "implied false certification theory" when a party falsely certifies compliance with Medicare's requirements, rendering the claim for reimbursement false.[7] *See Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 186, 190 (2016). But we must not veer off course: although the FCA permits *qui tam* actions, a relator cannot pursue a standalone action under the AKS or Stark Law—the FCA's power arises only when these violations result in *false claims submitted to the government*.

---

[7] "[L]iability can attach when the defendant submits a claim for payment that makes specific representations about the goods or services provided, but knowingly fails to disclose the defendant's noncompliance with a statutory, regulatory, or contractual requirement. In these circumstances, liability may attach if the omission renders those representations misleading." 579 U.S. at 181.

*First*, Winnon claims that SNF Defendants incentivized employees to increase Medicare patient referrals, citing one employee who qualified for "census" pay in 2015 and received a $1,000 bonus in 2016. But at most, these allegations, when accepted as true, establish only that an employee was incentivized to obtain referrals and was paid for doing so. The problem is that we cannot infer that referrals were obtained by SNF Defendants absent identification of the Medicare patient. That aside, nothing alleged suggests that services were actually provided to referred patients resulting in claims submitted for reimbursement. *Cf. United States ex rel. Barrett v. Columbia/HCA Healthcare Corp.*, 251 F. Supp. 2d 28, 35 (D.D.C. 2003) (finding Rule 9(b) unmet absent identification of the Medicare patient in the scheme).

*Second*, Winnon presumes that SNF Defendants increased their Medicare patient population by offering medical directorship arrangements to referring physicians. J.A. 27. By challenging the consistent monthly stipends paid to medical directors, she argues that these payments were improper because the invoices lacked details about the services rendered or the time spent. And her theory is based on overhearing Lozano discuss attending dinners with doctors coupled with, on one occasion, observing him return from dinner and express hope that he had secured an additional physician. *Id.* Then, in a separate conversation, Winnon alleges that Lozano told her he needed to "keep the doctors happy." *Id.* As support, Winnon points to two additional facts: (1) physicians hired as medical directors received a fixed monthly salary, which she found suspicious because consistent pay implied identical services each month; and (2) the Empire Spanish Meadows Facility, despite having fewer beds than the Katy Facility, employed five times as many medical directors. She contends that these factors suggest improper remuneration for referrals.

However, her complaint lacks the critical details necessary to state a plausible claim. We agree with the district court's survey of *Kaczmarcyk*, where that court found that the complaint provided sufficient detail under Rule 9(b) of the alleged scheme because the government alleged how the medical directorships agreements were a sham. *See United States ex rel. Kaczmarcyk v. SCCI Health Servs. Corp.*, Civ. No. H-99-1031, 2004 WL 7089810, at \*4–7 (S.D. Tex. Mar. 11, 2004). The court explained that three of the physicians hired as medical directors admitted approximately fifty percent of the patients during a specified period; the medical directors were compensated at a rate exceeding fair market value for the services they were expected to perform; and past referrals were used to set contract rates. *Id.* at \*4–5.

Here, Winnon's complaint fails to identify any specific agreements conditioning payment to medical directors on referrals. Instead, she only points to an email exchange showing that the agreements could not be found. Beyond that, she does not allege when or where such agreements were made or explain how these payments resulted in claims submitted to Medicare or Medicaid. *Cf. United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 191–92 (5th Cir. 2009) (explaining that the relator alleged specific details of "the date, place, and participants [of a] dinner meeting at which two doctors . . . attempted to bring him into the fold" of the scheme); *Riedel*, 332 F. Supp. 3d at 71 (referencing the relator's presence at a Board of Directors meeting where paying fees to physicians and never billing patients was discussed). While she speculates that these arrangements were made over dinner, nothing Lozano said elevates that assumption beyond conjecture.

And although the court notes the static nature of the payments, Winnon offers only the assertion that such

consistency was "unlikely"—a far cry from establishing a nexus between the payments and services rendered. It is troubling that the invoices were blank, but suspicion alone does not suffice. These allegations, even taken together, do not transform conjecture into the "reliable indicia" required to show that remuneration influenced referrals and led to false claims. *Heath,* 791 F.3d at 126. Without these essential details, her claims rest on speculation rather than fact.

The same is true of Winnon's assertions that Empire Spanish Meadows had fewer beds than the Katy Facility but more medical directors, and that the Katy Facility simultaneously paid one medical director $2,000 per month and an additional $3,000 per month to the same individual as a "nursing consultant." Although Winnon's allegations hint at irregularities in the payment structure at these facilities, nothing alleged here connects these payments to false claims submitted for reimbursement to Medicare or Medicaid.

*Third*, Winnon's allegations regarding the "marketing gifts" come close but ultimately fall short. She provides a table listing purported gifts and inducements, alleging they were given to hospital doctors and discharge planners who were in the position to influence referrals to SNF Defendants' facilities. She further claims SNF Defendants had a financial incentive to induce referrals, as they "made millions each year off Medicare," with Lozano and Balentine personally profiting. From this, she asks the court to infer two things: (1) that the remuneration "would not have continued over the course of several years had [it] not resulted in referrals," and (2) that the persistence of these payments suggests that patient referrals led to false claims. J.A. 36–37. Not quite.

Her argument has some intuitive appeal. Businesses do not typically spend money on something that yields no return. And

she does offer some particular details: she identifies specific gifts, dates, and the individuals receiving them. But Rule 9(b) demands more than details; it requires a bridge between those details and the submission of false claims. *Heath*, 791 F.3d at 126.

By comparison, in *Thomas*, the relators alleged that: defendants paid the medical directors varying rates based on the value and volume of each referral; fake time entries and compensation sheets were created that were different from the actual time physicians worked; medical director pay was reduced when referrals decreased; and specific patients referred by specific medical directors in exchange for remuneration with dates patients were admitted. *See United States ex rel. Thomas v. St. Joseph Hospice, LLC*, No. 2:16-cv-143, 2019 WL 1271019, at *10 (S.D. Miss. Mar. 19, 2019).

That bridge is missing here. Although Winnon offers partial, particularized facts and some indicia of inducement, she furnishes little basis for the strong inference she asks the court to draw. She assumes that because payments persisted, they *must have* resulted in referrals, and that those referrals *must have* led to false claims. But nothing ties those payments to actual claims submitted for Medicare reimbursement. Winnon needed to provide particular details about the Medicare patients and the dates they were admitted. We can only infer that the marketing gifts were payment for the *missing* patient referrals. We agree with the district court that Winnon's claims are closer to those in *Emanuele*, where the court found that the general number of referrals could not be connected to the particular medical directors, deeming the information provided insufficient to meet the Rule 9(b) standard. *See Emanuele v. Medicor Assocs.*, No. 10-cv-245, 2013 WL 3893323, at *8 (W.D. Pa. July 26, 2013).

Curious minds may ask, what else were these gifts for, if not referrals? A fair question, but one that distracts from the main point. Rule 9(b) is not about rhetorical flourishes—it demands specificity or at least enough for the court to make a strong inference. Suppose, for instance, a hospital discharge planner directed referrals to one of Lozano's facilities after receiving a gift. That patient may or may not have been admitted. More importantly, no facts show whether claims were actually submitted for that referral. *Grubbs,* 565 F.3d at 190 ("A hand in the cookie jar does not itself amount to fraud separate from the fib that the treat has been earned when in fact the chores remain undone."). So, even if Winnon sufficiently alleged an intent to induce referrals, intent alone does not establish a FCA violation.

In sum, perhaps the answer rests with the missing reliable indicia—facts that allege communications discussing a *quid pro quo*, records tracking referrals post-gift, or examples of distinct positive trends of patients whose admission and billing can be traced to the alleged inducements. Winnon provides none of that. From her allegations we glean inferences—faintly, with squinted eyes. Unfortunately, without concrete allegations connecting the remuneration to actual false claims, her theory remains just that—a theory.[8] Thus, the district court's dismissal of Winnon's remuneration claims is valid.

**2.**

Next up are the inflated therapy billing claims. Winnon alleges that SNF Defendants conspired with RehabCare to

---

[8] Without sufficient allegations that false claims were submitted, Winnon has no viable FCA violation. We therefore decline to address her arguments on scienter and vicarious liability, as they bear no impact on the outcome.

systematically inflate RUG classifications to maximize Medicare reimbursements. She cites, for instance, the Katy Facility's billing of 81.8% of its patients at the Ultra-High therapy level in 2014—placing it in the top 1% of SNFs nationally—and an average of 42.9 days of Ultra-High therapy per patient, nearly double the national average. Similar allegations target the RJ Alice Facility, where Winnon contends that RehabCare manipulated therapy classifications for financial gain.

We conclude that Winnon's reliance on statistical anomalies falls short of satisfying Rule 9(b)'s heightened pleading standard. While statistics may be alleged as a "reliable indicia" of fraud, they alone do not meet Rule 9(b) unless accompanied by specific details of the fraudulent scheme. *See Heath*, 791 F.3d at 126 (quoting *Grubbs*, 565 F.3d at 190); *Carrel v. AIDS Healthcare Found.*, 898 F.3d 1267, 1277 (11th Cir. 2018) (explaining that relators cannot "rely on mathematical probability to conclude that the [defendant] surely must have submitted a false claim at some point"). Such details must, at the very least, provide concrete examples of false claims submitted to the government and may include specificity regarding dates, claim amounts, and the patients involved. By contrast, we agree that complaints that pair statistical anomalies with concrete evidence—say, pre-printed billing codes linked to specific patient cases—sufficiently meet this standard. *See, e.g., United States ex rel. Harris v. Bernad*, 275 F. Supp. 2d 1, 4 (D.D.C. 2003).

In short, while Winnon's statistical references may raise a red flag, they do not establish that the inflated RUG classifications resulted in false claims. Winnon fails either to provide specific examples of improperly classified patients or explain how the fraudulent scheme was executed. Because she relies on comparisons to national averages without identifying

particular claims for reimbursement, she falls short of the "reliable indicia" required under Rule 9(b). Moreover, although she identifies three patients from the RJ Alice Facility as examples of overbilling, she does not show why the services provided were medically unnecessary or unreasonable under Medicare guidelines. Without such particulars—patient diagnoses, dates of service, or exact claim amounts—her allegations remain conclusory.

Thus, while the statistical anomalies suggest potential issues, they fall far short of the detailed factual connection necessary to show that fraud was committed. The district court's dismissal of these inflated therapy billing claims is, therefore, proper. [9]

### III.

For the foregoing reasons, we affirm the district court's judgments dismissing Winnon's claims.

*So ordered.*

---

[9] Because we affirm the district court's dismissal of all Winnon's federal claims, we decline to exercise supplemental jurisdiction over any remaining state law claims. *See* 28 U.S.C. § 1367(c)(3).

KATSAS, *Circuit Judge*, concurring in part and dissenting in part: This False Claims Act case involves services provided at skilled nursing facilities (SNFs). The defendants include eight affiliated SNFs, two of their owners, and a contractor that provided therapy at the facilities. Relator Terri Winnon alleges that the facilities and the contractor jointly submitted false claims to the government for therapy services provided by the contractor. Winnon further alleges that the facilities paid physicians and others unlawful kickbacks, through marketing gifts and sham medical directorships, in exchange for patient referrals. The district court dismissed the claims against the contractor based on the FCA's public-disclosure bar, and it dismissed the claims against the SNF defendants for failure to satisfy heightened pleading standards. My colleagues affirm the dismissals in full. I would affirm as to all claims except those based on the marketing gifts.

I

The district court properly dismissed the claims against the contractor, RehabCare Group East, LLC, based on the public-disclosure bar. In pertinent part, the bar requires dismissal of FCA claims if "substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed," unless the relator was an "original source" of the disclosed information. 31 U.S.C. § 3730(e)(4)(A). As my colleagues explain, this case rests on "substantially the same allegations or transactions" already disclosed in prior litigation against RehabCare. Likewise, the complaint alleges no facts supporting a plausible inference that Winnon qualifies as an "original source." Subject to two small caveats, I agree with my colleagues' reasoning on these points.

First, my colleagues analyze the claims against RehabCare under current law. These claims arise from services allegedly

provided and billed from January 2009 through February 2016. Congress substantially amended the public-disclosure bar on January 23, 2010, *see* Pub. L. No. 111-148, § 10104, 124 Stat. 119, 901–02, and did not make the amendments retroactive. The earlier version of the bar thus applies to claims that RehabCare submitted before January 23, 2010. The amendments clarified the prior governing standard, *see United States ex rel. O'Connor v. USCC Wireless Inv., Inc.*, 128 F.4th 276, 284–85 (D.C. Cir. 2025), so the change in law does not materially affect the case for dismissal here. But for claims governed by the pre-amendment bar, the dismissal should be for lack of jurisdiction. *See* 31 U.S.C. § 3730(e)(4)(A) (1986); *O'Connor*, 128 F.4th at 284.

Second, in making the public-disclosure bar an affirmative defense, the 2010 amendments introduced some procedural complications. The complaint here did not need to anticipate and rebut the public-disclosure bar as a possible affirmative defense. *See de Csepel v. Republic of Hungary*, 714 F.3d 591, 608 (D.C. Cir. 2013). And the defendants filed a motion to dismiss for failure to state a claim, before even raising the defense in an answer. Nonetheless, dismissal is proper where "the facts that give rise to the defense are clear from the face of the complaint." *O'Connor*, 128 F.4th at 285. Here, the complaint affirmatively invoked the prior litigation against RehabCare, and thus alleged the facts giving rise to the defense. As for the original-source question, the relator must plead and prove that point, which is an exception to the defense and turns on facts most likely known by the relator. *See id.* at 287. Given this scheme, I do not think the complaint needed to anticipate the defense and plead facts to establish the original-source exception. But once the defendants established the public-disclosure bar based on allegations in the complaint,

it became the relator's burden to establish the exception, either based on the complaint or by seeking leave to amend it.

Winnon claims to be an "original source" under the second prong of the governing definition, which extends to individuals who have "independent" information that "materially adds" to the publicly disclosed allegations and who "voluntarily provided" the information to the government before filing the complaint. 31 U.S.C. § 3730(e)(4)(B). The complaint here does claim that Winnon is an original source. J.A. 13. But as my colleagues explain, its allegations on that point are conclusory. And although Winnon seeks a remand to file an amended complaint, she does not explain how any amendment would expand the original-source allegations in her current, twice-amended complaint. Nor did she provide any such explanation to the district court. Under these circumstances, the district court did not abuse its discretion in dismissing without leave to amend. *See, e.g.*, *Firestone v. Firestone*, 76 F.3d 1205, 1208 (D.C. Cir. 1996); *Rollins v. Wackenhut Servs., Inc.*, 703 F.3d 122, 130–31 (D.C. Cir. 2012).

II

Two sets of claims against the SNF defendants were properly dismissed, but a third was not.

First, the district court properly dismissed claims that the SNF defendants submitted false claims for services provided by RehabCare. In my view, the public-disclosure bar forecloses these claims, because the prior litigation had alleged that RehabCare caused skilled nursing facilities "to submit false claims to Medicare for therapy services" that RehabCare provided at those facilities. J.A. 401. And the only evidence that Winnon claims to have provided the government as an

original source indicates that one of the SNF defendants "billed an incredibly high rate of ultra-high therapy codes during 2014." *Id.* at 51. Without more, that information neither materially adds to previously disclosed allegations nor alleges a plausible and particularized case of fraud.

Second, the district court properly dismissed claims that the SNF defendants used sham medical directorships to pay doctors in exchange for patient referrals. On this point, Winnon's case for fraud rests on violations of statutes barring Medicare providers from paying third parties to induce patient referrals. However, these statutes expressly permit compensation arising from "bona fide employment relationship[s]." 42 U.S.C. § 1320a-7b(b)(3)(B); *id.* § 1395nn(e)(2). And the complaint does not allege facts supporting a plausible inference that the directorships were anything other than bona fide employment, for reasons my colleagues explain.

Finally, the district court erred in dismissing claims against the SNF defendants based on what they themselves describe as marketing gifts paid to local doctors and hospital discharge planners. These claims lie at the intersection of the FCA and the Anti-Kickback Statute (AKS). The FCA imposes civil liability on anyone who knowingly presents "a false or fraudulent claim for payment" to the government. 31 U.S.C. § 3729(a)(1)(A). The AKS makes it unlawful to knowingly offer "any remuneration (including any kickback, bribe, or rebate)" in order to induce referrals for furnishing services that may be paid by the government. 42 U.S.C. § 1320a-7b(b)(2)(A). Moreover, a claim for services "resulting from a violation" of the AKS "constitutes a false or fraudulent claim" for FCA purposes. *Id.* § 1320a-7b(g).

The complaint in this case alleges a striking pattern of AKS violations. According to the complaint, the records of one defendant nursing facility indicate a raft of gifts made to local physicians and discharge personnel at local hospitals. These records show that between February 2013 and May 2015, this facility made 45 such gifts, totaling over $23,000 in value. For each of the gifts, the records indicate the date, gift, cost, and recipient. The gifts cluster around six named physicians as well as discharge personnel at four named hospitals. Sometimes, the physician or the hospital is identified by name; sometimes, the gift is identified as being "for doctors and discharge planners" or "for case managers." J.A. 33–35. Twenty-two of the gifts are identified as "marketing" meals, items or gifts. *Id.* Most of the gifts involve food or liquor, though one involves $200 "for ballet school for daughter" of a named physician. *Id.* at 33. Not surprisingly, the complaint alleges that these gifts were intended to induce referrals, that they did induce referrals, and that the facility submitted claims to Medicare "for services rendered to illegally referred patients." *Id.* at 5. In my view, this account easily suffices to allege FCA violations with the particularity required by Federal Rule of Civil Procedure 9(b), and the plausibility required by *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).

The SNF defendants mostly ignore these allegations, though Winnon led with them in her opening brief. The defendants briefly assert that these gifts showed "nothing more than Defendant Facilities' efforts to market themselves, which is not unlawful." SNF Defendants' Br. 30–31. Far from exonerating, that characterization is a virtual admission of AKS violations. By its terms, the AKS prohibits providers to make any cash or in-kind "remuneration" in order "to induce" a third party to refer Medicare beneficiaries. 42 U.S.C. § 1320a-7b(b)(2)(A). Almost by definition, gifts in connection with the

"marketing" of a skilled nursing facility involve that facility seeking the referral of more patients.  Moreover, the carveout for payments pursuant to bona fide employment obviously does not apply to marketing gifts of food, liquor, and ballet school.  And the AKS civil-liability provision confirms that prohibited "remuneration" includes giving away items "for free or less than fair market value" if done "as part of any advertisement or solicitation."  *Id.* § 1320a-7a(i)(6)(H)(i).

My colleagues conclude that Winnon has not adequately alleged that the improper gifts caused additional referrals or, in turn, the submission of false claims.  However, we have previously held that identifying specific tainted referrals is not "an indispensable requirement of a viable False Claims Act complaint" so long as the relator alleges facts supporting "a strong inference that [false] claims were actually submitted." *United States ex rel. Heath v. AT&T, Inc.*, 791 F.3d 112, 126 (D.C. Cir. 2015) (citation omitted).  This case illustrates the wisdom of that rule.  My colleagues begin by asking a very good question—"what else were these gifts for, if not referrals?"—but they then dismiss it as mere "rhetorical flourish[]."  *Ante* at 24.  In my view, the SNF defendants have all but admitted that their "marketing" gifts were intended to induce patient referrals.  And the possibility that the gifts had their intended effect—causing *some* additional referrals— seems to me a very strong inference from the number, frequency, duration, value, nature, and recipients of the gifts themselves.  Moreover, it seems to me a virtual certainty that some of the referred individuals would include elderly persons who are Medicare beneficiaries, thus connecting the tainted referrals to the submission of false claims.  My colleagues are correct that the complaint would have been stronger had Winnon been able to allege things like an express *quid pro quo* or the existence of records tracking specific referrals due to gifts.  *Id.*  But the plaintiff need not have a proverbial smoking

gun in order to survive a motion to dismiss, even in cases governed by Rule 9(b). To me, the necessary inferences of causation here appear not "faintly, with squinted eyes," *id.*, but rather in plain view.

For these reasons, I would reverse the dismissal of the claim based on the alleged improper marketing gifts, and I would otherwise affirm.